800 A.2d 132 (2002)
352 N.J. Super. 245
NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, Plaintiff-Respondent,
v.
J.Y. and E.M., Defendants-Appellants.
In the Matter of B.Y., E.M., and J.A.M., Minors.
Superior Court of New Jersey, Appellate Division.
Argued April 30, 2002.
Decided June 11, 2002.
*134 Mary Potter, Designated Counsel, argued the cause for appellant J.Y. (Peter A. Garcia, Acting Public Defender, attorney; Ms. Potter on the brief).
D. Marie Harrison, Designated Counsel, argued the cause for appellant E.M. (Peter A. Garcia, Acting Public Defender, attorney; Ms. Harrison on the brief).
Lisa J. Rusciano, Deputy Attorney General, argued the cause for respondent New Jersey Division of Youth and Family Services (Peter C. Harvey, Acting Attorney General, attorney; Andrea M. Silkowitz, Assistant Attorney General, of counsel; Ms. Rusciano, on the brief).
Guadalupe Casillas, Law Guardian, argued the cause for respondents B.Y., E.M., and J.A.M., minors (Peter A. Garcia, Acting Public Defender, attorney; Ms. Casillas, on the brief).
Before Judges WEFING, CIANCIA and FUENTES.
*133 The opinion of the court was delivered by FUENTES, J.S.C., temporarily assigned.
These consolidated appeals are taken from the Superior Court, Chancery Division, Family Part's judgment awarding legal and physical custody of three minor children Bobby, age six; Ethan, age four; and Jane age three[1] to their maternal aunt and uncle.[2] Defendant J.Y. is the *135 mother of all three of the children. Defendant E.M. is the father of Ethan and Jane. Bobby was fathered by A.J. who is currently serving a long-term state prison sentence. J.Y. and E.M. are appealing the Family Part's custody orders. A.J. is not a party in the appeal. We remand for a full hearing for the Family Part to make specific factual findings and conclusions of law.

DYFS PRE-ACTION PROCEEDINGS
The Division of Youth and Family Services (DYFS) filed a verified complaint and order to show cause in the Family Part seeking legal custody of Bobby, Ethan and Jane pursuant to the provisions of N.J.S.A. 9:6-8.21 and N.J.S.A. 30:4C-12. The order to show cause was filed to continue DYFS's legal custody of the children which had been obtained through a voluntary agreement entered into with defendant J.Y. Physical custody of the children was held by relatives of J.Y. Bobby had been placed with his maternal aunt and uncle in West Milford, New Jersey. Ethan and Jane had been placed with their maternal grandparents in Tafton, Pennsylvania. DYFS also sought leave of court to continue this arrangement.
The verified complaint named J.Y., E.M. and A.J. as defendants and alleged incidents of abuse and neglect involving all three children. Although the verified complaint listed sixteen separate paragraphs purporting to establish a pattern of abuse or neglect, a careful review of the allegations in the complaint reveals only one substantiated[3] incident of neglect limited to J.Y. and E.M. involving Ethan and Jane. There were no allegations directly involving Bobby. For the most part the complaint chronicled a history of repeated DYFS involvement with this family, based on third party referrals or complaints.
The complaint alleges that on May 14, 1996, the Family Part judge sitting in Passaic County ordered DYFS to investigate J.Y.'s home situation after she filed a domestic violence complaint against A.J. In the domestic violence complaint J.Y. alleged that A.J. had threatened to kill her and their son Bobby. The court granted a final restraining order against A.J. The verified complaint in support of the petition for involuntary removal does not indicate the results of this investigation or any other action taken by DYFS.
On September 11, 1996, Passaic General Hospital informed DYFS that Bobby had been admitted with second degree burns. The doctors in the burn unit believed that the injuries were accidental. The hospital notified DYFS that the previous month Bobby had been treated for a sprained shoulder. Hospital staff had not considered the shoulder injury to be suspicious at the time. DYFS determined that both incidents occurred while in E.M.'s care and concluded that he "lacked knowledge and experience with babies." DYFS kept the file open for "supervision" until June 17, 1997. The case was then closed.
On August 21, 1997, the case file was reopened based on a referral from an unidentified individual who alleged witnessing A.J. hit Bobby. Aside from this cryptic description, the verified complaint contains no other information as to this event. DYFS investigated the matter *136 and concluded that the allegations were not substantiated.[4] The case was kept open to offer the family Emergency Child Assistance Program (ECAP) services. The only "services" described in the complaint were some type of family counseling. Here again the complaint is sparse in details. We are unable to determine the specific counseling provided, how long it lasted and who actually participated. On August 17, 1999, almost two years after this referral, DYFS again closed the case.
On September 13, 1999, DYFS received a referral from a social worker at St. Joseph's Hospital reporting an accident in which Jane suffered a fractured femur as a result of falling down a flight of stairs. The social worker expressed "concern" that a lack of parental supervision may have been the possible cause of the accident.
DYFS reopened the case and once again found insufficient evidence to substantiate that Jane had been abused or neglected. The investigation revealed only that J.Y. and E.M. did not have a crib for Jane or a safety gate for the stairs. J.Y. and E.M. assured DYFS that they would obtain both items, and the case was again closed on November 3, 1999.
The case was reopened on June 22, 2000, prompted by a referral from an unidentified person who said that Bobby stated that each morning E.M. would enter Bobby and Ethan's beds and squeeze the boys' testicles. Bobby also claimed, according to this unidentified person, that E.M. touched Jane's "private parts." This anonymous individual further alleged that J.Y. instructed Bobby not to tell "M.," his great-grandmother. J.Y. purportedly agreed to talk to E.M. about this incident.
DYFS determined the allegations were unfounded[5] but due to J.Y. and E.M.'s extremely poor housekeeping skills, ECAP services were again made available to the family. Once again, the complaint gives no other description of the type of services offered. Whatever "services" were provided failed to produce any positive results. Over a four month period, June 22, 2000 to October 24, 2000, DYFS indicated that the apartment was in a state of disrepair and lacking in basic housekeeping. There were holes in the walls, doors hanging off their hinges, rodent infestation, and exposed electrical wires in the bathroom. Despite these documented conditions, DYFS did not initiate any action to remove the children or assist the family in relocating to more suitable accommodations.
On October 24, 2000, DYFS learned that J.Y. had been admitted to the hospital suffering from diabetes and a bladder infection. She had apparently arranged for the children to stay with a neighbor. The verified complaint provides no other information as to J.Y.'s hospitalization, i.e., its duration, the seriousness of her illness or its potential impact on her ability to parent the children. Similarly, there is no indication that this temporary custody arrangement *137 with the neighbor was unsuitable or otherwise placed the children at risk.[6]
It is this event that triggered DYFS's direct intervention by formally obtaining legal custody of the children. J.Y. agreed to sign a fifteen-day informed consent placement agreement temporarily relinquishing custody of all three children to DYFS. At DYFS's direction Bobby was placed with a maternal aunt. Ethan and Jane were placed with the maternal grandmother.
The next day, October 25, 2000, the maternal aunt informed DYFS that while visiting with Ethan and Jane, she noticed multiple bruises on the children while bathing them and that the children had told her that E.M. had hit them. The Clifton Police Department was notified. Both the police department and DYFS attempted to contact E.M. by telephone and mail without success. The verified complaint avers that an investigation of these allegations against E.M. has not been completed. There is no evidence in the record before us that any criminal charges have been brought against E.M.
On November 18, 2000, J.Y. signed a six-month informed consent placement agreement, extending the children's placement with her relatives. The verified complaint asserts that after this date, from November 18, 2000, until March 27, 2001, J.Y. failed to maintain contact with DYFS.
On March 27, 2002, J.Y. left a telephone message with DYFS saying that she was employed, was not making much money and wanted assistance from DYFS. The record does not indicate if any assistance was given.
In the order to show cause, DYFS asked the court for legal custody of all three children and continuation of the physical custody agreement in place.

PROCEDURAL HISTORY OF THIS ACTION
On June 1, 2001, the trial court entered an order to show cause, returnable June 12, 2001. The order granted interim legal custody of the children to DYFS and physical custody with the maternal relatives, as requested in the complaint. A law guardian was also assigned to represent the interests of the children. The form of order stated in pertinent part:
... the Court having read the verified complaint, affidavits and other supporting documents, the Court therefore determines that the removal of the child(ren) is necessary to avoid ongoing risk to the life, safety or health of the child(ren), because ... [a blank area is provided for the judge to state the reasons] and for the other reasons stated on the record.
The only indication of the judge's reasons for entering the order is a handwritten reference to "8A-O of complaint" appearing in the blank area of the form of order as described above. This appears to be an attempt by the judge to incorporate by reference the allegations contained in paragraph 8, sections A-O of the verified complaint as a basis for the relief granted. In the same form of order, there are six "check-off" boxes pertaining to DYFS's statutory duty under N.J.S.A. 30:4C-11.2 to utilize all reasonable efforts to prevent placement prior to seeking the involuntary removal of the children. Here again the *138 judge merely checked off the first box which read:
The Court has determined that reasonable efforts to prevent placement prior to removal were made, as indicated in paragraphs [blank area is provided] of the attached complaint.
The same handwritten reference to "8A-O" was inserted in the blank space provided. There is no other record of the judge's decision detailing the reasons for granting this type of emergent ex parte relief.
The transcript of the order to show cause proceedings reflects that all three parents were present. J.Y. was represented by counsel. E.M. and A.J. were not. No witnesses were sworn, questioned or cross-examined. No documentary evidence was marked, properly admitted or considered by the reviewing judge. The entire procedure was more like an informal chat than a court proceeding.
The deputy attorney general (DAG) representing DYFS addressed the court and made the following factual representations:
We would like [J.Y.] to maintain regular contact with the Division and inform us of her whereabouts. The worker has made a number of appointments with [J.Y.] to sit down and talk to her to discuss what help the Division can give her with respect to getting her help with some kind of housing, et cetera, and they don't seem to be able toto get in the same place at the same time. She's either not been there or appointments have been canceled, et cetera. So, we would like to have her meet with the case worker so that we can address some of the housing issues.
This alleged lack of cooperation was disputed by J.Y. through her counsel. Furthermore, it is clear from the record that J.Y.'s attorney believed it was J.Y.'s duty to develop a plan for the return of her children. This position, relieving DYFS of its statutory duty to develop a plan and employ all necessary resources to bring about family reunification, was adopted by the judge.
[J.Y.'s ATTORNEY]: Your Honor, at this point, as I understand it, basically you want my client to develop a plan for the children and meet with the case worker. I really haven't heard any other requests of the Division for any other evaluations or
THE COURT: Before she leaves today, she can speak with the case worker.
The court, without any competent evidence or having made any factual findings, ordered that legal custody of the children remain with DYFS and continued the physical custody arrangement which placed one child in New Jersey and the other two in Pennsylvania. There were also no formal provisions made for J.Y. and E.M. to visit with the children, leaving it up to DYFS, the parties and the caretakers to work out the details. Finally, at the request of the Law Guardian, but without any evidence of emotional problems or psychiatric illness, the judge ordered J.Y. and E.M. to undergo psychological evaluations.
The next court event, a case management conference, occurred more than two months later on August 21, 2001. At that time, despite the prior order placing two of the children in Pennsylvania, all three children were living with the maternal aunt and uncle in Hewitt, New Jersey. There is no indication that DYFS obtained or even sought judicial approval before changing the children's placement.
The transcript of the proceedings reveals the existence of some type of report which was made available to the Family Part judge.
*139 [CARETAKER]: They [referring to the children] are happy.
THE COURT: Good. Well, I can read that in the report. I see that.
In its brief filed in response to this appeal DYFS refers to this report as a "progress report" filed with the court pursuant to R. 5:12-4(f). Although it appears the report dealt with the children's adjustment to their foster care environment and was obviously read and considered by the Family Part judge, it was never marked or admitted into evidence under R. 5:12-4(d). Thus, it is not available for our review as part of the record of the proceedings.
In this proceeding, the DAG's opening remarks to the court again included factual representations regarding J.Y.'s failure to cooperate with DYFS's efforts to provide her with services. This was again disputed by J.Y.'s attorney. The court did not take any steps to hear competent evidence on this issue. The lawyers were simply allowed to comment upon facts directly relevant to determining whether or not DYFS was complying with its statutory duty to develop and implement a plan to bring about family reunification. N.J.S.A. 30:4C-11.1.
It appears from this colloquy between counsel and the court that J.Y. and E.M. had been visiting the children under the supervision of the caretaker. The court-ordered psychological evaluations had not yet taken place. A new appointment date was scheduled. J.Y. was also to begin a six-week parenting class. It is not clear from the record whether these parenting classes were made available to J.Y. through DYFS, or whether she made these arrangements herself.
At one point in the proceedings the court asked the parties if they would stipulate to the allegations of abuse or neglect contained in the verified complaint in lieu of the court making specific factual findings. The record indicates that the judge considered this a "procedural problem."
As a procedural problem, we have one or two things. If I can get a stipulation of both of you on the fact finding today, I don't have to bring you back until October. [Two months later.] Otherwise, I have to bring you back real quick on a short date for the fact finding and then another date right after that. You want to talk to your clients and ask them for stipulations?
After what the attorneys involved characterized as "a brief recess" to allow the parties to confer with counsel, J.Y. and E.M. agreed to stipulate to a single unspecified allegation in the complaint. This decision was communicated to the court by defense counsel. The judge did not question the parties directly to determine if they understood the legal significance of this stipulation nor did the judge inquire as to which allegation of abuse or neglect was the subject of the stipulation. The judge then concluded that DYFS's actions and involvement up to this point were justified and that all statutory requirements had been met.
Sometime thereafter the parties signed a written form of stipulation and order provided by the court. This form of order contained "check off" boxes preceded by a preprinted paragraph describing the evidence that was ostensibly reviewed and relied upon by the court in entering the order. The judge checked off the box which read: "Reasonable efforts to prevent placement have been unsuccessful." This document does not make any specific reference to any evidence considered by the court.
On September 24, 2001, J.Y. appeared at her psychiatric evaluation. The report of this evaluation was not marked into evidence, but was submitted on this appeal. *140 The report stated that at the time of the interview J.Y. lived with a neighbor and worked as a teacher for one and two-year-old children. It indicated that she and E.M. were no longer living together, but were working through their issues. The doctor found that J.Y. was interested in caring for her children but due to her ongoing relationship with E.M. the children would be at risk of further neglect or harm if they were returned to her care. E.M. never had a psychological evaluation.
On October 30, 2001, the parties returned to court for a review hearing pursuant to the provisions of N.J.S.A. 9:6-8.54(b)(2). DYFS, with the law guardian's support, requested that legal custody of all three children be transferred to the maternal aunt and uncle. Defense counsel for both J.Y. and E.M. objected to the request, arguing that their clients were cooperating with DYFS and wanted to regain custody of their children.
The judge,[7] without the benefit of an evidentiary hearing, relied on the DAG's representations that the parents had been uncooperative with DYFS's efforts to stabilize the family's living conditions. Specifically, the DAG indicated that J.Y. had failed to find a suitable apartment and had not completed parenting classes and that E.M. had failed to keep scheduled appointments for his psychological evaluation. The court also considered another unidentified report which again was not admitted into evidence or otherwise made part of the record. Despite this dearth of competent evidence, the parents' claim for custody and the dispute concerning DYFS's efforts to assist the parties, the judge made the following finding:
I think the Division has formulated a plan for you that, should you meet those requirements, you would then be in a position to attempt or to petition forto have custody returned. Maybe that's something that'sthat's down the road.
In the meantime, the children have to be taken care of. So, I am going to go with the Division's recommendations at this time. I, again, emphasize, I really don't care for an attitude that, when there's an obligation on behalf of an agency to find people, that they say: `They haven't contacted us.' I don't understand that. And I'mI'm sensing that that's going to lead us to a disaster sooner or later.
If there's a requirement to provide services, those services have to be provided. If there's a requirement to attempt reunification, I want to see some positive steps that reunification is being attempted. And that's exactly where I'm going to leave it.
The court entered an order that day granting legal and physical custody of all three children to the maternal aunt and uncle. The order also dismissed the case from further litigation. It is from this order that defendants appeal.

LEGAL ANALYSIS
DYFS's legal authority to bring an emergent application seeking the involuntary removal of a child from his or her place of residence is exclusively derived from two separate statutory schemes, N.J.S.A. 9:6-8.21 to -8.73 and N.J.S.A. 30:4C-11 to -14. See also New Jersey Division of Youth and Family Services v. E.B., 137 N.J. 180, 185, 644 A.2d 1093 (1994); In re Guardianship of G.S III, 137 N.J. 168, 172, 644 A.2d 1088 (1994); New Jersey Division of Youth and Family Services v. K.M., 136 N.J. 546, 552, 643 A.2d 987 (1994).
*141 R. 5:12-1(a) requires that the complaint for removal be brought as a summary proceeding pursuant to R. 4:67. Thus, as a threshold procedural issue, a Family Part judge presented with an order to show cause and verified complaint seeking the involuntary removal of a child must comply with the requirements of R. 4:67-2(a), which provides in pertinent part:
The proceeding shall be recorded verbatim provided that the application is made at a time and place where a reporter or sound recording device is available. The court if satisfied with the sufficiency of the application, shall order the defendant to show cause why final judgment should not be rendered for the relief sought.
In order to determine the "sufficiency of the application" not only for purposes of setting a return date but more importantly for ordering emergency relief, the judge must consider and apply the statutory standards found in both Title 9 and Title 30.
A judge may not enter an order directing the temporary removal of a child without a hearing, absent a specific finding that the three statutory conditions have been met. N.J.S.A. 9:6-8.28 requires the judge to be satisfied by a preponderance of the evidence and guided by the overriding principle that "the safety of the child shall be of paramount concern" that:
1) the parent or other person legally responsible for the child's care is absent or, though present, was asked and refused to consent to the temporary removal of the child and was informed of an intent to apply any order applicable under this section [of the statute];
2) the child appears so to suffer from abuse or neglect of his parent or guardian that his immediate removal is necessary to avoid imminent danger to the child's life, safety or health;
3) there is not enough time to hold a preliminary hearing.
These findings must be made on the record and supported by specific reference to the evidence relied upon by the judge. Such evidence may include, but is not limited to, police reports or other law enforcement records, hospital records, school records or other professional reports containing information relevant to the child's health and safety or the parent's fitness or whereabouts. R. 5:12-4(d). The judge may also consider the testimony, under oath, of a DYFS representative who can attest to the efforts undertaken to determine whether the above-cited statutory requirements have been met. Although such testimony may include hearsay statements, the judge must be satisfied that the evidence adduced provides a sufficiently reliable basis upon which to make the required findings. N.J.S.A. 9:6-8.46.
The requirements under Title 30 address similar concerns, balancing the procedural due process rights of the parent or guardian against the need to take immediate action to protect the health and safety of the child. In this respect, Title 30 provides a second layer of procedural safeguards which must be addressed by the judge reviewing applications for this type of emergent relief.
N.J.S.A. 30:4C-12 requires DYFS to investigate complaints of child abuse or neglect. Prior to seeking legal custody of a child, DYFS is required to show that reasonable efforts were undertaken to keep the family intact. N.J.S.A. 30:4C-11.1.[8]
*142 If after completing its investigation DYFS concludes that involuntary removal of the child is warranted, it may apply to the Family Part for "an order making the child a ward of the court and placing such child under the care and supervision of Division of Youth and Family Services." N.J.S.A. 30:4C-12. As with the procedure outlined in Title 9, the court must conduct a summary hearing with notice to the child's parents or guardian. At this hearing, the burden of proof is upon DYFS to present sufficient competent and credible evidence to satisfy the judge that the best interests of the child, as defined by the statute, requires ordering the requested emergent involuntary placement. Here the Family Part failed to follow any of these procedural requirements. The order to show cause was issued ex parte, off the record, and without addressing any of the statutory requirements.
Parents have a fundamental constitutional right to raise their children. Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551, 558 (1972); NJ Div. of Youth and Family Servs. v. A.W., 103 N.J. 591, 599, 512 A.2d 438 (1986). However, the constitutional protection surrounding family rights is tempered by the State's parens patriae responsibility to protect the welfare of children. Parham v. J.R., 442 U.S. 584, 603, 99 S.Ct. 2493, 2504, 61 L.Ed.2d 101, 119 (1979); In re Guardianship of K.H.O., 161 N.J. 337, 347, 736 A.2d 1246 (1999). Thus, in order to relieve the tension created by these potentially disparate constitutional principles, the court's authority to remove children from the custody of their parents must be exercised with scrupulous adherence to procedural safeguards.
These safeguards are designed to serve dual salutary functions: to protect innocent parents against precipitous governmental intrusion or interference with their fundamental right to the parental relationship and to spare the children the emotional trauma resulting from an unwarranted separation from their parents. We find that the Family Part completely disregarded its responsibilities in this respect, to the detriment of all involved. As we noted in Salch v. Salch, 240 N.J.Super. 441, 443, 573 A.2d 520 (App.Div.1990):
Failure to perform the fact-finding duty `constitutes a disservice to the litigants, the attorneys and the appellate court.' Meaningful appellate review is inhibited unless the judge sets forth the reasons for his or her opinion. In the absence of reasons, we are left to conjecture as to what the judge may have had in mind.
See also Cameco, Inc. v. Gedicke, 157 N.J. 504, 509-510, 724 A.2d 783 (1999); Curtis v. Finneran, 83 N.J. 563, 569-570, 417 A.2d 15 (1980); R. 1:7-4(a).
On the return date of the order to show cause, the court is required to make specific findings that the parent or guardian is present or has been notified of the hearing. N.J.S.A. 9:6-8.41; R. 5:12-2. The judge must advise the parents of their right to counsel and, if they are indigent, arrange to have them apply for representation through the Office of the Public Defender. N.J.S.A. 9:6-8.43. At this stage of the proceedings the court must make specific factual findings to determine "whether the child is an abused or neglected child" as defined by the statute. N.J.S.A. 9:6-8.44; N.J.S.A. 9:6-8.21(c).
The court's role in the fact-finding process has been carefully prescribed by the Legislature in a series of specific statutory *143 provisions. The consistent legislative concern running through the entire statutory scheme is "the safety of children" as a "paramount concern." N.J.S.A. 9:6-8.49 mandates scheduling priority in cases "involving imminent or actual physical harm, or in which a child has been removed from home before a final order of disposition. Any adjournment granted in the course of such a proceeding should be for as short a time as possible." The judge's determination that a child has been abused or neglected must be based on a preponderance of the evidence standard and "only competent, material and relevant evidence may be admitted." N.J.S.A. 9:6-8.46(b).
The criteria for sustaining or dismissing a complaint of abuse or neglect are delineated in N.J.S.A. 9:6-8.50.
(a) If facts sufficient to sustain the complaint are established ... the court shall, subject to the provisions of subsection c. hereof, enter an order finding that the child is an abused or neglected child and shall state the grounds for such findings.
(b) If the proof does not conform to the specific allegations of the complaint, the court may amend the allegations to conform to the proof; provided, however, that in such case the respondent [parent or guardian] shall be given reasonable time to prepare to answer the amended allegations.
(c) If facts sufficient to sustain the complaint under this act are not established, or the court concludes that its assistance is not required on the record before it, the court shall dismiss the complaint and shall state the grounds for the dismissal.
(d) If the court makes a finding of abuse or neglect, it shall determine, based upon the facts adduced during the fact-finding hearing, and upon any other facts presented to it, whether a preliminary order pursuant to [N.J.S.A. 9:6-31] is required to protect the child's interests pending a final order of disposition. The court shall state the grounds for its determination. In addition, a child found to be abused or neglected may be removed and remanded to a place designated by the court or be placed in the custody of a suitable person, pending a final order of disposition, if the court finds that there is a substantial probability that the final order of disposition will be an order of placement under [N.J.S.A. 9:6-8.54].
Here the Family Part disregarded this detailed legislative mandate and failed to make any specific factual findings. The court relied instead on an amorphous stipulation by the parties which made general reference to "at least one" of the allegations in the verified complaint. This patently did not constitute the fact-finding contemplated by the Legislature.
As we have noted, only one out of the sixteen allegations listed in the complaint was actually substantiated by DYFS. Ironically, although DYFS confirmed that the children were subjected to deplorable living conditions, it did not initiate any legal action to remove them from their parents' custody or assist the family to find suitable housing.[9] The event triggering DYFS involvement, *144 J.Y.'s hospitalization, is totally lacking in crucial details and does not, on its face, support a finding of abuse or neglect within the meaning of N.J.S.A. 9:6-8.21(c).
Second, the perfunctory manner in which the judge treated the fact-finding process undermined its importance and relegated it to a mere technicality. In fact, the judge advised the litigants that by stipulating to an unidentified, undisclosed allegation in the complaint they would expedite the process and avoid the inconvenience of returning to court on some future date.
Finally, the manner in which the entire proceeding was conducted included none of the elements ordinarily deemed indispensable to an adjudicative hearing. Documents were reviewed and considered by the court without any identification for the record. This not only violated basic rules of trial practice, R. 1:2-3, but inhibited the appellate process by depriving the appellate court of a complete record on appeal. S.R.H. Corp. v. Rogers Trailer Park, Inc., 54 N.J. 12, 18-19, 252 A.2d 713 (1969). Attorneys were permitted to make material factual representations that were then accepted by the court in lieu of sworn testimony from witnesses. Litigants and other individuals with an interest in the case, such as caretakers, were permitted to casually address the court on material issues of fact without being sworn as witnesses or subjected to cross-examination.
Trial judges are given wide discretion in exercising control over their courtrooms. State v. Castoran, 325 N.J.Super. 280, 739 A.2d 97 (App.Div.1999), certif. den. 163 N.J. 78, 747 A.2d 286 (2000); State v. Cook, 330 N.J.Super. 395, 750 A.2d 91 (App.Div.), certif. den. 165 N.J. 486, 758 A.2d 646 (2000) Ryslik v. Krass, 279 N.J.Super. 293, 298, 652 A.2d 767 (App. Div.1995); Horn v. Village Supermarkets, Inc., 260 N.J.Super. 165, 175, 615 A.2d 663 (App.Div.1992), certif. den. 133 N.J. 435, 627 A.2d 1141 (1993). However, the trial judge has the ultimate responsibility of conducting adjudicative proceedings in a manner that complies with required formality in the taking of evidence and the rendering of findings. See Casino Development Authority v. Lustgarten, 332 N.J.Super. 472, 496-498, 753 A.2d 1190 (App.Div.), certif. den. 165 N.J. 607, 762 A.2d 221 (2000); N.J.R.E. 611(a); R. 1:10-1.
The fact-finding hearing is a critical element of the abuse and neglect process. The judge, as the fact-finder, is there "to determine whether the child is an abused or neglected child as defined herein." N.J.S.A. 9:6-8.44. The judge's determination has a profound impact on the lives of families embroiled in this type of a crisis. Judicial findings based on unspecified allegations, hearsay statements, unidentified documents and unsworn colloquy from attorneys and other participants erodes the foundation of the twin pillars upon which the statute rests: (1) that no child should be exposed to the dangers of abuse or neglect at the hands of their parent or guardian; and, commensurately, (2) that no parent should lose custody of his/her child without just cause.
The judge's determination, therefore, must be based on competent reliable evidence. N.J.S.A. 9:6-8.46; R. 5:12-4(d). The judge must articulate, with particularity, the facts upon which a determination of abuse or neglect is made. N.J.S.A. 9:6-8.50. These factual findings must be supported *145 by evidence admitted during the hearing, which shall be held on the record. All documentary exhibits considered by the court must be clearly identified for appellate review. R. 1:2-3. Testimonial evidence must be presented through witnesses who are under oath, N.J.R.E. 603, and subject to cross-examination. N.J.R.E. 611. In short, this critically important part of the business of the Family Part demands meticulous adherence to the rule of law.
Here, at the urging of the judge, the parties agreed to waive the right to a fact-finding hearing and admitted to having committed some unspecified act or omission constituting neglect or abuse. As a threshold issue, we do not hold that factual stipulations triggering a finding of abuse or neglect are never permissible or appropriate. As a general proposition, stipulations permit parties in a civil case to agree on relevant facts, thereby narrowing the area of dispute requiring the production of evidence and promoting the efficient administration of justice. Matter of Robinovitz, 102 N.J. 57, 61, 505 A.2d 595 (1986); Negrotti v. Negrotti, 98 N.J. 428, 432, 487 A.2d 328 (1985). However, a stipulation must be definite and certain in its terms and the consent of the parties to be bound by it must be clearly established. Kurak v. A.P. Green Refractories Co., 298 N.J.Super. 304, 325, 689 A.2d 757 (App.Div.), certif. den. 152 N.J. 10, 702 A.2d 349 (1997); Schere v. Township of Freehold, 150 N.J.Super. 404, 407-408, 375 A.2d 1218 (App.Div.1977). A factual stipulation in an abuse or neglect case must conform to these same standards. That is, the judge must be satisfied that there is a factual basis from which to conclude that defendants have committed some specific act or acts which constitute abuse or neglect as defined in N.J.S.A. 9:6-8.21(c) and that the parents willingly, knowingly and voluntarily agree that they have committed these acts.
Since the judge in these cases is also the fact finder, the need to preserve judicial neutrality and objectivity is paramount. Clearly then the judge in an abuse or neglect proceeding must play no role in advising or otherwise suggesting to a defendant to waive any of his or her legal rights. This is a matter that must be left entirely up to defendant to decide in consultation with competent counsel.
Furthermore, like waivers in other legal settings, the judge hearing an abuse and neglect case, before accepting a defendant's stipulation in lieu of a fact-finding hearing, must first determine that the waiver involved "the intentional relinquishment of a known right ... evidence[d] by a clear, unequivocal and decisive act from which an intention to relinquish the right can be based." Country Chevrolet v. North Brunswick Planning Board, 190 N.J.Super. 376, 380, 463 A.2d 960 (App.Div. 1983); See also Shebar v. Sanyo Business Systems Corp., 111 N.J. 276, 291, 544 A.2d 377 (1988); Playmates Toys, Inc., v. Director of the Division of Taxation, 316 N.J.Super. 509, 512, 720 A.2d 655 (App.Div.1998); aff'd, 162 N.J. 186, 742 A.2d 968 (1999). This determination must be made by the judge on the record before a party can be deemed bound by the stipulation. Schere v. Township of Freehold, Supra. The judge must also directly apprise defendants of their rights under Title 9 to a fact-finding hearing where the burden of proof will be on DYFS to establish the elements of abuse and neglect by a preponderance of the evidence. N.J.S.A. 9:6-8.46(b).
We are aware that N.J.S.A. 9:6-8.47(a) provides that: "Upon completion of the fact-finding hearing, the dispositional hearing may commence immediately after the *146 required findings are made." The legal defects permeating the "fact-finding" process here are sufficient in themselves to require us to remand this case without reaching its dispositional phase. We are, nevertheless, compelled to address the serious legal defects also affecting the dispositional stage.
N.J.S.A. 9:6-8.45 defines the "dispositional hearing" as "a hearing to determine what order should be made." As with the fact-finding hearing, "only material and relevant evidence may be admitted" in a dispositional hearing. N.J.S.A. 9:6-8.46(c). Thus, the dispositional hearing must observe the same procedural and substantive requirements applicable to the fact-finding hearing.
N.J.S.A. 9:6-8.51(a) sets out a menu of dispositions available to the judge.
At the conclusion of a dispositional hearing under this act, the court shall enter an order of disposition: (1) suspending judgment in accord with [N.J.S.A. 9:6-8.52]; (2) releasing the child to the custody of his parents or guardian in accord with [N.J.S.A. 9:6-8.53]; (3) placing the child [with a relative or other suitable person or the division] in accord with [N.J.S.A. 9:6-8.54]; making an order of protection in accord with [N.J.S.A. 9:6-8.55]; (5) placing the respondent on probation in accord with [N.J.S.A. 9:6-8.56]; (6) requiring that an individual found to have abused or neglected a child accept therapeutic services, and this order may be carried out in conjunction with any other order of disposition. (Emphasis added).
In 1999 the Legislature made two significant changes to the statutory scheme regulating DYFS's authority to involuntarily remove children from the custody of their parents. First, it amended N.J.S.A. 9:6-8.54(a) to require the Family Part to make a specific finding that DYFS has made "reasonable efforts[10] to prevent placement" before placing a child in the custody of a relative. Second, it adopted three new provisions to Title 30 further requiring the Family Part to determine whether the case fell within certain statutorily enumerated categories, thereby relieving DYFS of its obligation to make reasonable efforts to bring about family reunification. N.J.S.A. 30:4C-11.1; N.J.S.A. 30:4C-11.2; N.J.S.A. 30:4C-11.3.
Subsection (b) of N.J.S.A. 30:4C-11.1 specifically provides that:
In any case in which the division accepts a child in care or custody, the division shall make reasonable efforts, prior to placement, to preserve the family in order to prevent the need for removing the child from his home. After placement, the division shall make reasonable efforts to make it possible for the child to safely return to his home.
Here, the Family Part judge decided to place the children with the maternal aunt and uncle without a hearing and over the objections of both parents without making any findings as to reasonable efforts. This proceeding was also conducted with the same informality and general lack of adherence to fundamental evidentiary rules that characterized the "fact-finding" hearing.
In the course of oral argument all of the attorneys involved, including the DAG and the Law Guardian, indicated, in response *147 to our questions, that the procedural history described here is representative of how DYFS applications for legal custody are heard and decided in the Family Part in the vicinage in question and perhaps in others as well. In other words, based on these lawyers' experience, the adjudicative methods employed here were not aberrational but represented the typical "business as usual procedure" in cases involving the involuntary removal of children from their parents. If this is so, immediate corrective measures must be taken to restore the appropriate adjudicative process in these cases.
We remand for the Family Part to conduct such proceedings as may be required under the current circumstances, consistent with this decision. We do not retain jurisdiction.
NOTES
[1] The names used are fictitious to protect the children's confidentiality.
[2] On March 28, 2002, the law guardian filed a motion for a limited remand since the child Ethan was no longer residing with the maternal aunt and uncle. Ethan was residing with the maternal grandparents in Pennsylvania. DYFS joined in the motion. Defendants objected. The court denied the motion. In the course of oral argument all counsel agreed to preserve the status quo pending a decision from this court.
[3] N.J.A.C. 10:129A-3.3(a)(1) defines "substantiated" as when the available information, as evaluated by the Division representative, indicates that a child is an abused or neglected child as defined in N.J.A.C. 10:133-1.3 because the child has been harmed or placed at the risk of harm by a parent, caregiver, temporary caregiver or institutional caregiver.
[4] N.J.A.C. 10:129A-3.3(a)(2) defines "not substantiated" as when the available information, as evaluated by the Division representative, provides some indication that a child was harmed or placed at risk of harm, but does not indicate that the child is an abused or neglected child as defined in N.J.A.C. 10:133-1.3.
[5] N.J.A.C. 10:129A-3.3(a)(3) defines the term "unfounded" as when (1) there is no evidence of conduct that would pose risk to the child; (2) there is no evidence that a parent, caregiver, temporary caregiver, institutional caregiver or child was involved; or (3) the available information indicates that the actions of the parent, caregiver, institutional caregiver were necessary and reasonable and the incident was an accident.
[6] The verified complaint is also silent as to E.M.'s whereabouts at that time. As the father of two of the children E.M. had a cognizable interest in any custody arrangement. DYFS had a statutory obligation to make some effort to locate him and ascertain whether he was able to assume temporary custody of his children. N.J.S.A. 9:6-8.28(a).
[7] This judge was new to the case. The record does not disclose why the previous judge was not available.
[8] This requirement is not applicable in situations where there has been a judicial determination that the circumstances of the case meet the criteria in N.J.S.A. 30:4C-11.2. Under this statute, DYFS is not required to provide reasonable efforts to prevent placement if the court determines that the criteria outlined in the statute are met. The statute requires that the parent subject the child to extreme forms of violence and that efforts to prevent placement are not reasonable due to the risk of harm to the child's health or safety.
[9] At oral argument the DAG indicated that DYFS is not legally responsible for providing services designed to assist defendants to find more suitable housing. However, a review of the relevant provisions of the Code reveals DYFS's obligation to provide this type of assistance. N.J.A.C. 10:133I-2.2(a)(3) requires DYFS to provide case management and services that will insure that the family has access to referrals to community-based agencies. N.J.A.C. 10:133-1.3 defines "emergency maintenance service" as the provision of food, clothing, shelter, furniture, appliances and similar necessities, needed by a client in a crisis, and not available elsewhere. The term "information and referral" is defined as the activity of informing an applicant or person referred for Division services about services available from public and private sources, based on a determination of need, knowledge of Division and community resources, and follow up where indicated.
[10] N.J.A.C. 10:133-1.3 defines "reasonable efforts" as "... the provision of services to the family that are individually assessed to be relevant to the case goal, coordinated with other services, available and accessible and that have a realistic potential to meet the child's needs for a safe, secure, and permanent relationship with a family or other permanent arrangement."