# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1855-23

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

G.I.M.,[1]

     Defendant-Appellant.

_____

IN THE MATTER OF J.A.M.
and Y.F., minors.

_____

     Submitted March 4, 2025 – Decided April 14, 2025

     Before Judges Bishop-Thompson and Augostini.

     On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Passaic County, Docket No. FN-16-0044-17.

---

[1] We use initials to protect records relating to child victims and fictitious names to protect the confidentiality of the record and privacy interests. See R. 1:38-3(d)(12).

Jennifer N. Sellitti, Public Defender, attorney for appellant (Meghan K. Gulczynski, Assistant Deputy Public Defender, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Sookie Bae-Park, Assistant Attorney General, of counsel; Alicia Y. Bergman, Deputy Attorney General, on the brief).

Jennifer N. Sellitti, Public Defender, Law Guardian, attorney for minors (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Melissa R. Vance, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant G.I.M. (Grace) appeals from the August 7, 2023 Family Part order finding she abused or neglected her minor children, J.A.M. (Jordan) and Y.F. (Ynez), under N.J.S.A. 9:6-8.21(c)(4)(b). Grace also appeals from the court's January 8, 2024 order terminating litigation. Having reviewed the record and applicable law, we affirm.

I.

We presume the parties are familiar with the facts. We summarize the facts from the record and the evidence adduced at the multi-day factfinding hearing. The Division of Child Protection and Permanency (the Division) has been involved with Grace for several years. Grace has six children; only two of

her children, Jordan, born in 2016, and Ynez, born in 2020, are the subjects of this litigation.

A. Prior History of Division Involvement.

On July 7, 2016, the Division emergently removed Grace's son, Joseph, and filed a verified complaint for protective services. Shortly thereafter, on July 27, 2016, the court transferred custody of Joseph to his father, Lawrence, over the Division's objection.

Jordan was born in November 2016, while the litigation involving his brother, Joseph, remained ongoing. Jordan, however, remained in Grace's custody. In December 2016, the court transferred legal custody of Joseph to both parents and transferred physical custody to Grace. Thus, both Joseph and Jordan were in Grace's custody in late 2016, and the Division maintained care and supervision of the children.

The Division's oversight of the family and litigation continued. In September 2017, Grace agreed to allow Joseph to live with his father, and Jordan remained with Grace in a shelter. In March 2018, Joseph and Lawrence were dismissed from the litigation.

On June 13, 2018, the Division emergently removed Jordan from Grace's custody because of substance abuse and mental health concerns, homelessness,

and Grace's psychiatric hospitalization. Jordan remained in the Division's custody in an unrelated resource home from June 2018 until July 2020 when he was returned to Grace's custody.

In February 2020, while the litigation continued and Jordan was living with a resource family, Ynez was born. Ynez remained in Grace's custody, and they were living with Grace's mother while the Division provided in-home supportive services to the family. Jordan was returned to Grace's custody on or about July 1, 2020, after the Division changed its permanency plan for Jordan from termination of parental rights to reunification.

For the next year, Grace and the children continued to live with Grace's mother, and during that time, the Division continued to have care and supervision of the children and provided ongoing supportive services. While the concerns that led to the Division's involvement with the family persisted, the court recognized that Grace had made progress addressing her substance abuse and mental health issues.

However, in July 2021, the court found that Grace continued to have "unaddressed substance abuse and mental health issues[,]" and she "failed to engage in the recommended substance abuse and mental health treatment[,] . . .

failed to address Jordan's needs," and had not followed through with treatment recommendations for him.

Around this time, Grace's mother moved out of state while Grace and the children continued to live in New Jersey. Over the next several months, after leaving Grace's mother's home, the family experienced housing instability and stayed in various places, including hotels.

On September 27, 2021, Grace and the children had been staying temporarily with a friend but had to leave the friend's residence. Grace contacted the Division for housing assistance, requesting that the Division place her and the children temporarily in a hotel. The Division denied the request, advising Grace she had to first contact the Board of Social Services for emergency housing assistance. Initially, Grace was placed in a hotel for two days. She requested the Division to pay for a hotel until she received her income tax refund and could locate an apartment, and ultimately, the Division paid for Grace and the children to stay at various hotels until November 17, 2021.

B. Incident of Abuse and Neglect.

In November 2017, Grace and the children were temporarily staying at the Howard Johnson Hotel. During the early morning hours of November 17, 2021, Grace was speaking with her brother on the phone about her current housing

5

situation; Jordan, then five years old, told Grace he wanted to return to his former resource family. Grace "snapped" at Jordan and threw an object[2] at the glass door, shattering it.

Grace then got into an argument with her boyfriend, who was staying in the hotel room as an unauthorized guest. He left the room, and Grace ran after him, leaving the children alone. A verbal argument ensued and continued while the couple was in the hotel parking lot. Shortly thereafter, at approximately 3:30 a.m., the police were called. Several officers responded, including Officer Adem Ceca. Ceca approached Grace and her boyfriend as they were arguing in the parking lot at the rear of the hotel.

Grace relayed to Ceca that she and her boyfriend had gotten into a verbal disagreement, and she threw an iPad, striking the glass door in the hotel room, breaking it. Grace acknowledged that she had difficulty controlling her anger.

Ceca noticed blood at the bottom of Grace's foot and saw a cut. He called for emergency medical assistance (EMS), who cared for Grace's injury. Ceca proceeded to Grace's room on the second floor and, although he did not fully

_____

[2] The record reflects Grace identifying the object as an air fryer. The police officer who responded that evening stated that it was an iPad.

enter the room, he observed the children sleeping. Sometime after 4:00 a.m., the officers left the hotel without further incident and did not notify the Division.

At approximately 10:30 a.m., Grace called her caseworker, Jamila Depena, and reported that she needed help and requested anger management classes. Depena described Grace as "upset" and reporting that she also wanted to get back on her medication. Grace explained to Depena what had happened that made her upset and angry with Jordan. She also expressed concerns about having not dealt with her grandmother's passing. After speaking with Grace, Depena returned several missed calls she received from the hotel, who advised the worker that they wanted Grace to leave the hotel.

Depena arrived at the hotel a short while later and went to Grace's room. Depena described seeing glass on the floor in the room "along the bottom of the closet, as well as near the furthest wall where there was a bed . . . ." There was also glass on the balcony, and the balcony door was shattered. She also observed the closet door was off the hinges. Grace told Depena that she had thrown an air fryer through the balcony glass door, causing the glass to shatter. Depena photographed the damage, and these photographs were admitted into evidence during the factfinding hearing. She also observed that Grace's foot was bandaged. Grace stated that she must have cut her foot during the incident.

A-1855-23

Depena described the room as a standard size hotel room with "two queen beds, a dresser, closet, and bathroom."  When she entered the room, Depena explained she saw the children leaving the room.  Grace admitted to Depena that her boyfriend had been "sleeping at the hotel with her."

Grace inquired of Depena as to whether the children were going to be removed.  After advising Grace that she was not sure, Grace asked for that not to happen, "but said if . . . we did remove the children she would be joining her grandmother."  After consulting with her supervisor, Depena advised that a removal would occur, and the police were contacted.

Officer West, accompanied by his partner, arrived to assist the Division with the removal of the children.  West spoke with Grace about the removal, who was upset and stated that she "would join her grandmother, who was deceased, as there was room for her in the cemetery plot."  West understood this statement as a suicidal statement and called for an ambulance.  Grace was transported to the hospital for evaluation and was later discharged.

The Division conducted an emergency removal of the children who were placed with an unrelated resource family.  As a result of this incident, the Division substantiated Grace for abuse and neglect because the aggravating factors outweighed the mitigating factors.  Depena detailed the aggravating

8

factors as: "[Grace's] failure to comply with court-ordered services to ensure the children's safety and well-being, the tender age of both the children . . . the repetitive pattern of abuse and neglect . . ." and the "perceived . . . threats of wanting to harm herself." The concern regarding the glass not having been cleaned up factored into the Division's assessment of risk as well. As for the mitigating factors, Depena explained: "[t]he children were not harmed;" and it was not cold enough that exposure to the outside air would have posed a risk to the children.

The Division filed an order to show cause and verified complaint for protective services, and on November 19, 2021, the court granted the Division continued custody, care, and supervision of the children. On December 16, 2021, at the return on the order to show cause, the court did not address the scheduling of a factfinding hearing. However, the record reflects that the factfinding hearing was scheduled for June 20, 2022, and thereafter was adjourned several times.

A factfinding hearing was ultimately conducted on June 5, 27, and July 31, 2023—approximately nineteen months after the Division obtained custody of the children and entered its administrative finding against Grace. The Division presented the testimony of West, Depena, and Ceca and admitted

various exhibits into evidence, including its investigative report for the November 17, 2021 incident and the pictures of the hotel room damage taken by Depena. Neither Grace nor the children's attorney (law guardian) presented any witnesses nor introduced any documentary evidence. The law guardian supported the Division's position.

On August 7, 2023, the court rendered an oral decision, finding the Division's witnesses credible and many of the facts uncontroverted, and detailing the condition of the hotel room after Grace threw an object at the glass door, causing it to shatter. The court concluded that the Division satisfied its burden by a preponderance of the credible evidence that Grace was "grossly negligent, and her actions and inactions placed the children at substantial risk of harm[,]" and "the children's physical condition was placed in imminent danger of becoming impaired as a result of [Grace's] failure to provide minimum care by allowing a substantial risk of harm."

On July 11, 2023, the court transferred legal and physical custody of the children back to Grace. On January 8, 2024, the court terminated litigation. This appeal followed.

On appeal, Grace argues her conduct was not grossly negligent, and the court erred in its evaluation of the underlying facts and the conclusions it drew

from those facts. She further contends the trial court misinterpreted the standard of imminent danger by speculating as to the possibility of harm to the children.

## II.

Appellate courts defer to the family court's fact findings provided those findings are "supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 412 (1998) (citing Rova Farms Resort, Inc. v. Invs. Ins. Co., 65 N.J. 474, 484 (1974)). "Therefore, '[w]e will not overturn a family court's factfindings unless they are so "wide of the mark" that our intervention is necessary to correct an injustice.'" N.J. Div. of Child Prot. & Permanency v. B.P., 257 N.J. 361, 374 (2024) (alteration in original) (quoting N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012)). "We invest the family court with broad discretion because of its specialized knowledge and experience in matters involving parental relationships and the best interests of children." F.M., 211 N.J. at 427. However, "[t]he family court's legal conclusions . . . are reviewed de novo." B.P., 257 N.J. at 374 (citing N.J. Div. of Child Prot. & Permanency v. A.B., 231 N.J. 354, 369 (2017)).

"Title Nine 'governs acts of abuse and neglect against a child.'" Ibid. (quoting N.J. Div. of Youth & Fam. Servs. v. A.L., 213 N.J. 1, 18 (2013)). "Its purpose is 'to protect children who have had serious injury inflicted upon them

and make sure they are immediately safeguarded from further injury and possible death.'" Ibid. (quoting A.L., 213 N.J. at 18) (internal quotation marks omitted). Title Nine's "paramount concern is the safety of the children and not the culpability of parental conduct." Id. at 374-75 (internal quotation marks and citations omitted).

Under N.J.S.A. 9:6-8.21(c)(4), an "abused or neglected child" is a child under eighteen years of age:

> whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian, as herein defined, to exercise a minimum degree of care (a) in supplying the child with adequate food, clothing, shelter, education, medical or surgical care though financially able to do so or though offered financial or other reasonable means to do so, or (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment; or by any other acts of a similarly serious nature requiring the aid of the court[.]

While the phrase "minimum degree of care" is not defined within the statute, our Supreme Court has recognized this standard refers to conduct that is "grossly or wantonly negligent, but not necessarily intentional." G.S. v. Div. of Youth & Fam. Servs., 157 N.J. 161, 178 (1999); see also Div. of Youth & Fam. Servs. v. T.B., 207 N.J. 294, 299-300 (2011). "Where an ordinary reasonable person

12

would understand that a situation poses dangerous risks and acts without regard for the potentially serious consequences, the law holds him responsible for the injuries he causes." Compare G.S., 157 N.J. at 179, with T.B., 207 N.J. at 309-10 (finding no gross negligence where a mother accidentally left her four-year-old son home alone, reasonably believing that his grandmother was there). The standard is not whether some potential for harm exists; rather, whether a parent has failed "to exercise a minimum degree of care when he or she is aware of the dangers inherent in a situation and [has] fail[ed] adequately to supervise the child or recklessly [has] create[d] a risk of serious injury to the child." G.S., 157 N.J. at 181.

In determining whether a child is abused and neglected, the court should base its decision on the totality of the circumstances. N.J. Div. of Youth & Fam. Servs. v. V.T., 423 N.J. Super. 320, 329 (App. Div. 2011). We recognize that what constitutes abuse and neglect must be "analyzed in light of the dangers and risks associated with the particular situation at issue." N.J. Dep't of Youth & Fam. Servs. v. J.L., 410 N.J. Super. 159, 168 (App. Div. 2009) (citing G.S., 157 N.J. at 181-82).

The issue before us is whether the trial court erred in finding, pursuant to subsection (4) of the statute, that Grace's conduct, by her actions and inactions, amounted to grossly negligent deprivation of a minimum degree of care.

Many of the facts are undisputed. Grace, out of anger and in response to a comment made by five-year-old Jordan, threw an air fryer or iPad at the glass door with sufficient force to shatter the glass. As a result, there was a large hole in the door, leading to the outside balcony of their second-floor hotel room. After this incident, an argument between Grace and her boyfriend ensued. Grace ran out of the room after her boyfriend, leaving the children alone in the room in this condition for some undetermined amount of time. There was no evidence in the record that Grace made any attempt to clean up the glass before she left the children alone in the room and ran out after her boyfriend. Not only did Grace create this dangerous condition, as the trial court concluded, but she was injured by it when she "cut her foot on the broken glass."

While it is undisputed that the children were not physically injured, the "absence of actual harm" to the children, however, does not negate a finding of abuse and neglect. A.L., 213 N.J. at 23. Our child welfare laws clearly provide that "[a] court 'need not wait until a child is actually irreparably impaired by parental inattention or neglect.'" Ibid. (quoting In re Guardianship of D.M.H.,

161 N.J. 365, 383 (1999)). In fact, the Division's substantiated finding of abuse and neglect was not based on actual harm to the children but instead, on Grace's actions and inactions creating a situation that placed the children in imminent danger of harm due to their mother's failure to exercise a minimum degree of care.

Grace argues that the risk of harm to the children was neither substantial nor imminent. We disagree. In examining the totality of the circumstances, the trial court did not err in relying on the testimony of Depena and the pictures documenting the damage to the balcony glass door, nor in finding that the condition of the room where the children were located for approximately nine hours was dangerous and created an unacceptable risk to their physical condition.

By the time the caseworker arrived the next day, visible shards of glass remained on the floor and the glass door with its sharp edges remained accessible to the children. Additionally, the closet door remained off its hinges and propped up against the wall. The dangerous condition was created by Grace's actions and not the circumstances of the family's living situation. Moreover, the competent evidence does not support Grace's assertion that she acted diligently

to remediate the dangerous condition until such time as she and the family could relocate.

There is also no question that these young children, ages five and almost two, required intensive and continuous supervision.  Other than advising the caseworker that she made sure the children did not step on the glass, there was no evidence in the record that Grace took steps to remediate the situation, for instance, by reporting it immediately to the hotel management or requesting housekeeping to clean the glass from the room.

In evaluating Grace's conduct, and whether she failed to exercise a minimum degree of care, the trial court found that Grace was grossly negligent because she allowed this situation to persist knowing "that injury is likely to, or probably will, result" because she herself was injured by it.  Div. of Child Prot. & Permanency v. E.D.-O, 223 N.J. 166, 188 (quoting G.S., 157 N.J. at 178). The purpose of Title Nine is "to assure that the lives of innocent children are immediately safeguarded" from the risk of harm.  Id. at 187 (quoting State v. P.Z., 152 N.J. 86, 96-99 (1997)).  "[I]n focusing on the risk of harm . . . from grossly negligent conduct of a parent or guardian, the Legislature sought to squash the notion of a 'free pass' if the child did not suffer actual harm."  Ibid. (citing D.M.H., 161 N.J. at 383).  Thus, we are satisfied the trial court did not

err in finding that Grace not only created this dangerous condition in the family's living space but failed to take sufficient remedial steps to reduce the likelihood of substantial injury to the children from it.

Grace relies on several cases to support her assertion that her conduct involved ordinary negligence. At the outset, we recognize that allegations of neglect based on imminent danger and substantial risk of harm are "fact-sensitive and must be resolved on a case-by-case basis." Id. at 192. "There exists a continuum between actions that are grossly negligent and those that are merely negligent." T.B., 207 N.J. at 309. Each of the cases Grace cites for support are factually distinguishable.

T.B. involved a mother who left her four-year-old child alone for two hours under the mistaken belief that his grandmother was home. Id. at 294. In recognizing T.B. as a "close case," our Supreme Court differentiated T.B.'s conduct as "plainly negligent" because she did not leave the child home alone "knowing there was no adult supervision." Id. at 309.

In overturning the agency's finding of physical abuse in Div. of Youth & Fam. Servs. v. K.A., we found the incident of corporal punishment an isolated, aberrational incident for the family, which did not warrant removal or even continued Division involvement. 413 N.J. Super. 504, 512-13 (App. Div. 2010).

In N.J. Div. of Child Prot. & Permanency v. J.C., we reversed a court's finding of abuse and neglect based on the mother, who drank alcohol the night before, remained asleep in her bedroom, while her three-year-old son walked around the house. 440 N.J. Super. 568, 578-79 (App. Div. 2015). Again, in this isolated incident, we noted that the door left ajar by a third party was not known to the mother. Ibid. We further rejected the notion that the mother's failure to attend substance abuse treatment consistently, without more, constituted abuse and neglect. Id. at 580.

In J.L., we reversed the court's finding of abuse and neglect where a parent permitted her three and five-year-old children to return home from the playground in their condominium complex, watching them as they walked through the recreational area into the condo. 410 N.J. Super. at 168. Upon entering the home, the children were unable to open the door. Frightened, they called 9-1-1. Id. at 162. We noted that in walking home, the children did not have to cross any streets, and once inside, the children were safe and were within view of J.L. Id. at 168. While we agreed that J.L.'s conduct was arguably inattentive, it did not rise to the requisite standard of willful or wanton misconduct. Ibid.

18

Thus, unlike these cases, Grace not only was aware of the inherent dangers of the situation in the hotel room, but she also created the condition and failed to adequately remediate it for an extended period. Grace was aware that her young children were exposed to this dangerous scenario and were at risk of being harmed by it because she herself had been harmed by stepping on broken glass.

Lastly, Grace argues the delay of almost two years in scheduling the factfinding hearing refutes the immediacy of the danger to the children. Specifically, she contends this significant delay demonstrates an "utter lack of urgency to act to ensure the safety of the children . . . ." We reject this assertion.

Cases involving allegations of abuse and neglect brought by the Division pursuant to Title Nine are administered in our court system with priority. N.J.S.A. 9:6-8.33; Admin. Off. of the Cts., Admin. Directive #03-21, Family—Revised Children in Court Standards and Reissuance of Forms and the Appellate Division Protocol (Jan. 20, 2021). Following the Division's filing of a verified complaint alleging abuse and neglect, a factfinding hearing must be conducted unless the parent or guardian stipulates to the allegations in the complaint. Admin. Directive #03-21, attach. at 3. "The fact-finding hearing is a critical element of the abuse and neglect process." N.J. Div. of Youth & Fam. Servs. v J.Y., 352 N.J. Super. 245, 264 (App. Div. 2002).

As the factfinder, the court determines, based on the competent and reliable evidence presented, "whether the child is an abused or neglected child . . . ." Ibid. (quoting N.J.S.A. 9:6-8.44); N.J.S.A. 9:6-8.46; R. 5:12-4.  The Division has the burden of proving by a preponderance of the evidence that a child has been abused or neglected, and a factfinding hearing provides a parent with the opportunity to challenge the Division's administrative finding.  Id. at 266.

If a child has been removed from the home, a factfinding hearing shall be resolved in every abuse and neglect case within 120 days.  Admin. Directive #03-21, attach. at 3.  If the child has not been removed, then the factfinding hearing shall be resolved within 180 days.  Ibid.

Here, it is unclear from the record the reasons for this nearly two-year delay.  While adjournments are discouraged, there were several adjournments of the factfinding hearing in this case at the request of both the Division and Grace. See ibid.  Moreover, the present incident which led to Jordan's second and Ynez's first removal occurred in the context of ongoing, prior litigation.  During this time, the Division continued to provide services to the family, and the court continued to oversee compliance and enter orders to ensure the safety and well-being of the children.  While we do not condone such delay in the resolution of

a factfinding hearing, Grace's assertion that it demonstrates a lack of urgency to act to ensure the safety of the children is without merit.

We are satisfied there was competent, credible, and admissible evidence in the record to support the trial court's finding that Grace neglected her children by placing them at substantial risk of harm.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

A-1855-23