903 A.2d 1129

STATE OF NEW JERSEY DIVISION OF YOUTH & FAMILY
SERVICES PLAINTIFF, v. C.R. & R.R., DEFENDANTS.

IN THE MATTER OF J.R., T.R., AND A.R., MINORS.

Superior Court of New Jersey
Chancery Division Family Part
Cumberland County

Decided January 17, 2006.

364

*David D. Weber,* Deputy, Attorney General, for plaintiff.

*Frederick Declemet,* for defendants.

MENDEZ, P.J.F.P.

The issue before the court is which criteria should be used in determining whether a suspended judgment under *N.J.S.A.* 9:6–8.52 is an appropriate disposition.

On October 28, 2005, R.R.[1] knowingly, willingly and voluntarily agreed to waive his right to a fact-finding hearing at which the

---

[1] Because the Division is involved in this case the court chooses to use initials to identify the parties for the privacy of the family.

New Jersey Division of Youth and Family Services ("the Division" or "DYFS") would have the burden of proving a finding of abuse or neglect against him pursuant to *N.J.S.A.* 9:6–8.21 and *N.J.S.A.* 2C:43–12. R.R. stipulated to the following facts contained in paragraph 6 of the Division's June 16, 2005 complaint.

The R family became known to the Division on or about June 6, 2005, when a report was made alleging physical abuse on J.R., age 8. The reporter stated that J.R. had bruises on his left ear, his neck, the back of his head, and his upper left shoulder. It was reported that J.R. and his brothers, A.R. and T.R., had visited their father, R.R., for the weekend of June 3, 4, and 5, 2005. The reporter asked the children how J.R. obtained the bruises, and the children did not respond to the question, but instead looked at each other and put their heads down. The reporter believes the father is the perpetrator. There was no previous Division history on this family unit. The case was then opened for investigation.

On or about June 6, 2005, the assigned Division investigator went to the family's house. The investigator spoke to the mother, C.R., who informed the Division worker that J.R. did not tell her what happened to cause the bruises on his body. The mother stated that T.R. told her that their father, R.R., had hit J.R. and pushed him into his truck. T.R. also told his mother that R.R. had ripped J.R.'s shirt.

During the interview, C.R. stated that she had had several restraining orders on R.R. She told the Division worker that he was verbally abusive and had been physically abusive to her in the past. She described "fits of rage." C.R. stated that she and R.R. do "pick up and drop off curbside" to exchange the children for their bi-weekly visits with R.R.

The Division worker also attempted to interview J.R. at his home on June 6, 2005, in a back bedroom, with the permission of C.R. The worker was able to see the bruises on the child because he did not have a shirt on at the time of the interview since he had been swimming earlier. The Division investigator described marks that resembled finger shapes. When asked what happened

during the weekend, J.R. said "I got hurt." When the worker asked how he got hurt, J.R. replied that did not know. Later, J.R. told the worker, "Dad said he'll spank me if I tell."

While interviewing J.R., the Division investigator heard a loud banging on the door. R.R. had entered the house. J.R. heard his father ask for him. J.R. then hid under the computer desk in the room, and tried to pull down the keyboard tray to hide himself. The Division worker reported that J.R. squatted in a fetal position and remained silent. R.R. entered the room, but did not see the child. R.R. asked in a general way, where J.R. was located. The worker did not respond to the question, and R.R. left the room.

The Division worker described C.R.'s appearance as "mortified." C.R. told the worker that R.R. had come into the house uninvited. The Division worker addressed R.R. and asked to speak to him outside the house. The worker described the father's manner as "hostile." When R.R. and the worker went outside, R.R. refused to answer any questions regarding J.R.'s injuries, and stated that he would be talking to his attorney. After R.R. drove off, the Division worker again spoke with C.R. C.R. stated that she had spoken earlier in the day to R.R., but he had not offered any explanation as to how the injuries occurred. C.R. informed the worker that J.R. was on medication for Attention Deficit Hyperactivity Disorder ("ADHD"). C.R. stated that she always packs enough medication for the weekend. She said that she noticed that there was the same amount of medication in the weekend bag when the children returned home, signifying that J.R. had not been given his medicine during the visit.

On or about June 7, 2005, the Division worker took photographs of the child's injuries, as well as made an appointment on June 8, 2005, at NJ CARES Institute to have J.R. examined. Also on June 7, 2005, C.R. obtained an emergent order to temporarily stop the children's bi-weekly visits with R.R. On June 8, 2005, J.R. was examined at the NJ CARES Institute by Dr. Marita Lind. Lind described J.R. as afraid to tell her what happened. When asked if anyone told him not to tell, J.R. stated, "My dad. He will get in

trouble and I will get in trouble." When asked how he felt about his father hurting him, J.R. shrugged. He stated that the door of a car banged into his ear and his shirt ripped at the same time. J.R. said that after he hit the car, he laid on the ground for ten minutes.

On or about June 10, 2005, the Division worker learned that J.R. had disclosed to the police that his father, R.R., had caused the injuries. R.R. went to the police station on this date. While there, R.R. reported that J.R. had gotten paint on his truck. R.R. was charged with child endangerment.

At the fact-finding hearing during his stipulation that he committed acts of abuse and neglect, defendant R.R. applied to the court pursuant to *N.J.S.A.* 9:6–8.52 for suspended judgment. Defendant argued that his lack of any prior history with DYFS, his completion of services, and his acknowledgment of responsibility for his actions weighed in favor of a suspended judgment. Both the Division and the dispositional co-defendant, C.R., objected to R.R.'s request because of the seriousness of the abuse and neglect suffered by the child and because of defendant's lack of remorse. The Law Guardian took no position. Defendant R.R. was questioned by the court and made it clear that his stipulation was not conditioned on the court granting his request.

*CURRENT APPLICABLE STATUTES and CASELAW*

█ *N.J.S.A.* 9:6–8.51(a) states that at the conclusion of a dispositional hearing under Title 9, the court shall enter an order of disposition:

(1) suspending judgment; (2) releasing the child to the custody of his parents or guardian; (3) placing the child; (4) making an order of protection; (5) placing the respondent on probation; (6) requiring that an individual found to have abused or neglected a child accept therapeutic services, and this order may be carried out in conjunction with any other order of disposition.

Thus, procedurally, this court finds that an application for suspended judgment is timely and appropriate if made at the time of the fact-finding hearing. In suspending judgment, the court is guided by *N.J.S.A.* 9:6–8.52:

> a. The court shall define permissible terms and conditions of a suspended judgment. These terms and conditions shall relate to the acts of commission or omission of the parent or guardian.
>
> b. The maximum duration of any term or condition of a suspended judgment shall be one year, unless the court finds at the conclusion of that period, upon a hearing, that exceptional circumstances required an extension thereof for an additional year.

An examination of *N.J.S.A.* 9:6–8.52(a) reveals that the statute is broad: it allows the court to define the terms and conditions of a suspended judgment. It only requires that these terms and conditions relate to the acts of the parent or guardian. Paragraph (b) sets the maximum duration of any term or condition at one year, extendable to a second year upon a hearing. A search of case law concerning this statute yielded one result, *N.J. Div. of Youth & Family Servs. v. J.Y.*, 352 *N.J.Super.* 245, 800 *A.*2d 132 (App.Div.2002). The case merely references suspended judgment as one of the possible dispositions of a child abuse and neglect case under current statutes.

## *LEGAL DISCUSSION*

The legal discussion to follow will address what "terms and conditions of a suspended judgment" the court should order, and, more importantly, what factors the court should consider before deciding that suspended judgment is an appropriate disposition. This court is of the opinion that suspended judgment is a unique relief that may only be available in rare cases.

### Terms and Conditions

As *N.J.S.A.* 9:6–8.52 leaves it up to the court to "define permissible terms and conditions of a suspended judgment," the court turns to terms and conditions as defined by other jurisdictions. In New York, the Uniform Rules for the Family Court, 22 *NYCRR* § 205.50, outline the terms and conditions of order suspending judgment:

> (a) An order suspending judgment ... shall be related to the adjudicated acts or omissions of respondent and shall contain at least one of the following terms and conditions requiring respondent to:

(1) sustain communication of a substantial nature with the child by letter or telephone at stated intervals;

(2) maintain consistent contact with the child, including visits or outings at stated intervals;

(3) participate with the authorized agency in developing and effectuating a plan for the future of the child;

(4) cooperate with the authorized agency's court-approved plan for encouraging and strengthening the parental relationship;

(5) contribute toward the cost of maintaining the child if possessed of sufficient means or able to earn such means;

(6) seek to obtain and provide proper housing for the child;

(7) cooperate in seeking to obtain and in accepting medical or psychiatric diagnosis or treatment, alcoholism or drug abuse treatment, employment or family counseling or child guidance, and permit information to be obtained by the court from any person or agency from whom the respondent is receiving or was directed to receive such services; and

(8) satisfy such other reasonable terms and conditions as the court shall determine to be necessary or appropriate to ameliorate the acts or omissions which gave rise to the filing of the petition.

On its face, 22 *NYCRR* § 205.50 is very similar to *N.J.S.A.* 9:6–8.52. While 22 *NYCRR* § 205.50 stipulates that the court's order require the respondent to fulfill "at least one" of the enumerated terms and conditions (1) through (8), it provides similar broad discretion to the court in deciding whether to suspend judgment in the first place. Both *N.J.S.A.* 9:6–8.52 and 22 *NYCRR* § 205.50 require the terms and conditions relate to the acts or omissions of the defendant. The court finds that 22 *NYCRR* § 205.50 is helpful in providing guidance to New Jersey Courts in deciding what to include as terms and conditions in a suspended judgment order.

In this court's view, the conditions of the suspended judgment shall specifically outline all the services that the defendant must complete in order to correct the circumstances that led to the child's removal and involvement of DYFS with the family.

Is Suspended Judgment Appropriate?

While the court has broad discretion to "define permissible terms and conditions of a suspended judgment," how is it to

determine whether suspended judgment is appropriate in the first place, without guidance from either statute or case law?

As suspended judgment is similar to Pretrial Intervention ("PTI") in criminal dispositions, an examination of the PTI factors may prove helpful. *Rule* 3:28 of the Rules Governing The Courts of the State of New Jersey allows PTI in accordance with *N.J.S.A.* 2C:43–12 and 13. When a defendant charged with a penal or criminal offense is accepted into a PTI program, a judge may postpone all further proceedings against a defendant for a period of thirty-six months. At the conclusion of that period, a judge may dismiss the complaint, accusation, or indictment against the defendant, or proceed with the prosecution of the defendant where the conditions of PTI have not been met.

*N.J.S.A.* 2C:43–12 (a) states the public policy behind PTI. It should be limited to first time offenders under laws of New Jersey and the United States. PTI allows rehabilitative or supervisory services in lieu of criminal sentencing when services can reasonably be expected to deter future criminal behavior. PTI allows for an alternative for applicants who would be harmed by criminal sanctions. PTI permits a less burdensome form of prosecution. PTI helps to conserve limited judicial resources, allowing the judicial focus to remain on issues of serious criminality and correctional problems. PTI also deters participants from future criminal behavior through programs of supervisory treatment.

*N.J.S.A.* 2C:43–12 (b) states that admission into a program of supervisory treatment should be measured by applicant's amenability to correction, responsiveness to rehabilitation and the nature of the offense.

*N.J.S.A.* 2C:43–12 (e) uses the following criteria for participation in PTI:

(1) The nature of the offense;

(2) The facts of the case;

(3) The motivation and the age of the defendant;

(4) The desire of complainant or victim to forego prosecution;

(5) The existence of personal problems and character traits and whether they can be properly controlled through treatment;

(6) The crime's relation to a condition or situation that can be changed through participation in treatment;

(7) The needs and interests of the victim and society;

(8) The extent to which the applicant's crime constitutes part of a continuing pattern of anti social behavior;

(9) The applicant's record and possibility of being a substantial danger to others;

(10) Whether the crime is assaultive or violent in nature;

(11) Would prosecution exacerbate social problems that led to act;

(12) The history of use of physical violence against others;

(13) Involvement of applicant with organized crime;

(14) Value of supervisory treatment versus the public need for prosecution;

(15) States interest best served through prosecution of crime because of involvement of other people in the crime;

(16) Adverse effect on prosecution of codefendants;

(17) Harm done to society should be outweighed by benefits to society by placing offender in supervisory treatment.

 The court believes a similar public policy underlies suspended judgment in abuse and neglect cases. Suspended judgment should be a disposition limited to first time offenders under Title 9 or Title 30. Just like PTI, a suspended judgment allows rehabilitative or supervisory services in lieu of a permanent adjudication of abuse and neglect when services can reasonably be expected to deter future abuse and neglect. Similar to *N.J.S.A.* 2C:43–12 (b), which governs PTI, the court finds that admission into a program of supervisory treatment under an adjudication of suspended judgment should be measured by applicant's amenability to correction, responsiveness to rehabilitation and the nature of the offense. As in PTI, suspended judgment provides the court with an additional tool to dispose of cases and to encourage defendants to take full advantage of offered services.

 As for specific criteria for a disposition of suspended judgment, the court is guided by the PTI factors enumerated by *N.J.S.A.* 2C:43–12 (e) above. Particularly, the court finds applicable to suspended judgment the following PTI criteria: (1) the nature of the offense; (2) the facts of the case; (3) the motivation

and the age of the defendant; (5) the existence of personal problems and character traits and whether they can be properly controlled through treatment; (6) the crime's relation to a condition or situation that can be changed through participation in treatment; (7) the needs and interests of the victim and society; (8) the extent to which the applicant's crime constitutes part of a continuing pattern of anti social behavior; and (9) the applicant's record and possibility of being a substantial danger to others.

Using the above PTI criteria as guidance, the court believes the following four factors should be considered before granting a defendant a suspended judgment in abuse and neglect cases:

(1) defendant's prior history;

(2) seriousness of the offense;

(3) defendant's remorse and acknowledgment of the abusive/neglectful nature of his or her act; and

(4) defendant's amenability to correction, including compliance with court-ordered services, treatment, and his or her efforts in rehabilitating the relationship with the child[ren].

■ The court will assess each factor and carefully balance all the facts to determine whether to grant or deny the request to enter the finding of abuse and neglect subject to *N.J.S.A.* 9:6–8.52. In conducting this analysis, the court must always consider the best interests of the child and the objectives of Title 9 [2], Title 30 [3],

---

[2] *N.J.S.A.* 9:6–8.8 states: "The purpose of this act is to provide for the protection of children under 18 years of age who have had serious injury inflicted upon them by other than accidental means. The safety of the children served shall be of paramount concern. It is the intent of this legislation to assure that the lives of innocent children are immediately safeguarded from further injury and possible death and that the legal rights of such children are fully protected."

[3] The balance between fundamental parental rights and the State's *parens patriae* responsibility is achieved through the best interests of the child standard. *See In re Guardianship of K.H.O.,* 161 *N.J.* 337, 736 A.2d 1246 (1999). This standard has now been codified by statute, *N.J.S.A.* 30:4C–15.1., which governs the severability of parental rights.

and the Federal Adoption and Safe Families Act of 1997 ("ASFA").[4] Pub. No. 105–89, 111 Stat. 2115 (1997)

■ In considering factor one, if defendant has a prior finding of abuse and neglect, this will weigh heavily against providing defendant with another "bite at the apple." In this court's opinion, such a prior finding of abuse and neglect will disqualify the defendant from obtaining a suspended judgment. However, a prior history with DYFS without an adjudication of abuse and neglect will not result in automatic disqualification. In these cases, the court needs to examine the particular circumstances of the prior history.

■ The analysis of factor two—the seriousness of abuse and neglect—requires careful assessment of the facts that led to DYFS involvement in the case. In cases where the underlying facts involve circumstances such as lack of housing, mental health concerns, domestic violence, or drug or alcohol addiction, the court may be more inclined to consider a suspended judgment. But where the underlying incident amounts to a criminal offense or where the circumstances of abuse and neglect resulted in significant harm to the child—physical and/or emotional—the court should deny the suspended judgment application.

■ Factor three concerns defendant's remorse and acknowledgment of his or her actions. If defendant denies having committed the abuse or neglect, or portrays his or her actions as justified, this will weigh against a determination of suspended judgment. In most cases, an application for suspended judgment should be connected with a stipulation and/or an acknowledgment after the court has made a finding of abuse and neglect. A defendant that owns up to his or her problems is more likely to

---

[4] Essentially, ASFA makes clear that a child need not be forced to remain in or be returned to an unsafe home and allows the states to place the safety and welfare of the child before the interest of abusive parents. ASFA provides a specific timeline to achieve permanency for children.

complete services, with this resulting in a successful rehabilitation that can reasonably be expected to deter future abuse and neglect.

■ Finally, factor four addresses defendant's effort to complete services and visitation from the time of the Division's initial involvement, through the filing of the complaint, and through the 120–day period leading up to the fact-finding. The court will consider whether defendant has made a good-faith effort to comply with any treatment and services ordered by the court. Additionally, the court will consider whether defendant has been participating in any and all available visitation with the child[ren]. A defendant who regularly skips court-approved visitation and/or phone contact opportunities provides the court with the impression that ameliorating his or her relationship with the child[ren] is not defendant's first priority, and weighs against a disposition of suspended judgment.

■ In applying the above factors to the instant case, the court finds that, as for factor one, defendant R.R. does not have any prior findings of abuse and neglect, indeed, R.R. has no DYFS history at all. Factor two is the seriousness of the underlying incident of abuse and neglect. As a result of R.R. throwing his son J.R. against his vehicle, J.R. sustained significant bruising and abrasions over his left shoulder, his left ear, and the left side of his head. After J.R. disclosed to the police what his father had done, R.R. was criminally charged. The court finds that the underlying incident is serious in nature.

■ While J.R. did not sustain permanent physical damage from this incident, it does appear to the court that J.R. has suffered lasting emotional damage due to the actions of his father, not only from this particular incident, but in general. The court finds that the R children are extremely fearful of their father. When the DYFS worker questioned the children as to how J.R. obtained his injuries, the children put their heads down and did not respond, fearful to implicate their father. When the same investigator spoke with J.R. alone at his home on June 6, 2005,

J.R. told the worker that "Dad will spank me if I tell." During the interview, R.R. entered the home and when J.R. heard his father's voice, he hid under the computer desk in the room in a fetal position. The court believes that J.R.'s fearful response indicates a more serious, ongoing problem of emotional abuse in which the children are cowed into obedience through regular threats of violence, which combined with the seriousness of the underlying incident weighs heavily against the granting of suspended judgment.

 Factor three is defendant's remorse and acknowledgment of his actions. While Barr reported that "R.R. did not attempt to sugarcoat or justify his actions regarding J.R.," the court finds that R.R. lacks insight into his own responsibility for J.R.'s injuries. R.R. continually refers to what happened as an "accident," and portrayed his actions to Barr as "reflexive." By describing the incident in this way, as an "accident," R.R. implies that the resulting injury was not due to his own fault or misconduct. The court believes R.R.'s representations that he did not intend to injure his son to the extent to which he did. However, the only person responsible for controlling his anger and his "reflexive" responses is defendant himself. Therefore, this court in no way finds that J.R.'s injuries were suffered "accidentally." Further, the court finds defendant's attempt to conceal his actions as indicative of his lack of remorse. R.R. told his sons not to tell anyone what happened, he refused to speak with the Division caseworker, and did not elaborate on the impact of his actions to C.R. the children's mother, merely telling her that he went "ballistic" on J.R. Again, this factor weighs heavily against the granting of suspended judgment for the defendant.

 Factor four is defendant's compliance with court-ordered services and visitation. Since the inception of this case, R.R. has been completing all ordered treatment and services. However, R.R. has declined to visit with his children at the DYFS office for weekly supervised visits.

 In sum, the court finds that an order of disposition suspending judgment in accordance with *N.J.S.A.* 9:6–8.52 would not be appropriate in this case. While R.R. has no prior DYFS history, the incident of abuse was serious in nature, and the court also finds evidence of physical and emotional abuse, resulting in significant harm to the child. Further, R.R. has not to this court's satisfaction demonstrated remorse and/or acknowledgment of his actions. Lastly, although R.R. has complied with all ordered services and treatment, he has deliberately chosen not to visit with his children. As previously stated, suspended judgment is a unique dispositional tool only available in rare circumstances. This case does not come close to the type of cases that would warrant a suspended judgment. The Deputy Attorney General shall prepare the form of judgment.