# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1368-18T1

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

 Plaintiff-Respondent,

v.

B.M.,

 Defendant-Appellant,

and

J.A. and T.S.,

 Defendants.

_____

IN THE MATTER OF C.S.,

 a Minor.

_____

Submitted October 7, 2019 – Decided October 11, 2019

Before Judges Sabatino and Geiger.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Atlantic County, Docket No. FN-01-0194-17.

Joseph E. Krakora, Public Defender, attorney for appellant (Kevin G. Byrnes, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Donna Sue Arons, Assistant Attorney General, of counsel; Nicholas Joseph Dolinsky, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Sara A. Friedman, Designated Counsel, on the brief).

PER CURIAM

Defendant B.M. ("the mother")[1] appeals from the Family Part's fact-finding determination that she committed abuse or neglect of her four-year-old daughter C.S. in violation of N.J.S.A. 9:6-8.21(c)(2) and (c)(4)(b), by leaving her unsupervised in a house, and one in which drug transactions had been occurring. We affirm.

---

[1] We use initials for the persons in the household to protect the child's privacy, pursuant to Rule 1:38-3(d)(12). We shall refer to the child C.S. by the pseudonym "Clara."

# I.

The residence in question was the subject of a narcotics investigation by the Ocean County Prosecutor's Office and other authorities. The mother resided at the premises with her boyfriend, co-defendant J.A., who is not the child's father. The child was discovered at that residence unattended.

The Division of Child Protection and Permanency ("the Division") presented two witnesses at the fact-finding trial: a Galloway Township Police Detective, Bryan Casey; and a Division caseworker, Chaka James, who took part in the Division's investigation. We summarize the key facts shown by their testimony and the records admitted into evidence.

## A.

The Ocean County Prosecutor's Office was investigating multiple heroin overdoses in Ocean County. County narcotics investigators determined the overdoses had been caused by the victims ingesting a heroin stamped "King of Death." The Prosecutor's Office identified the mother's boyfriend J.A., through confidential informants, as the seller from whom informants were purchasing the heroin. J.A. went by the street name "Cash."

The Prosecutor's Office contacted Detective Casey, and told him about the narcotics activity and "Cash." Casey then took part in further investigation of the narcotics activity.

On January 29, 2017, Casey, along with six other detectives from County and local police forces, established surveillance in and around the area of the mother's residence on South Genista Avenue in Galloway Township. While on site, Casey observed J.A. conduct "several hand-to-hand narcotics transactions" with people who came to the residence.

At some later unspecified time that same day, the mother and J.A. left the residence by car. According to Casey, he was positioned at that time "maybe a hundred yards" from the residence, and therefore was unable to watch the mother and J.A. get into the car and leave. However, he observed them in their car when it came to the intersection with Route 30, where he was waiting in his police car.

Based on his earlier observations of what appeared to be drug transactions, Casey pulled the car over approximately a mile from the house, at the intersection of Route 30 and Pomona Road. J.A. was driving and the mother was in the passenger seat. Casey estimated this motor vehicle stop took about twenty to thirty minutes.

A-1368-18T1

As a result of the stop, J.A. was placed under arrest, and the mother was detained. Both J.A. and the mother were taken into custody and transported back to the Galloway Township Police Department.

According to Casey, Ocean County police officers went back to the home "right after" the traffic stop to "secure the residence." Casey learned those officers came in contact with an unattended four-year-old minor (i.e., Clara) inside the home.

Casey acknowledged that he did not have any direct contact with Clara. Any knowledge he had about Clara being alone or unattended when the officers first arrived was gained through other people.

After Casey pulled over J.A.'s vehicle, he applied to a judge for a search warrant for the mother's home. The warrant was approved several hours later. Casey then returned to the home to execute the warrant, along with multiple other officers. The search uncovered what Casey had believed to be heroin in the kitchen, packaged with the "King of Death" stamp.

The substance was not field-tested because the officers feared it might contain the dangerous chemical Fentanyl. Instead, the substance was sent to the State Police Forensic Laboratory for analysis. However, no test results were presented to the Family Part judge in this case.

A-1368-18T1

Casey was not the police officer who found the suspected heroin. However, he was inside the residence when another officer found it, and he testified to seeing the "King of Death" stamp on the drugs.

The report of the Ocean County Prosecutor's Office indicates the search also uncovered a prescription pill bottle, suspected to be morphine, under the bathroom sink, and a plastic bag containing "green vegetation," suspected to be marijuana, on the dining room table. Tests of these substances were not presented at the fact-finding hearing.

James, the Division's other witness, was assigned to the Division's initial response investigation. The primary caseworker for the Division, Christina Martella, did not testify, but her activities were described by James and documented in the Division's records admitted into evidence.[2]

During the pendency of the search warrant, the Division received a call from Police Officer Chris Maggazzo advising that Clara had been found home alone. The Division was told that Clara was now safe and at the house of a neighbor, named Dublin. James and Martella were asked to go to the Galloway Police station, where J.A. and the mother were being held, before responding to

---

[2] The interviews of the mother and Clara were performed by the primary caseworker, Martella. James was present for the interview with the mother and J.A., but was not present for the interview with Clara.

A-1368-18T1

the home.  While at the police station, Martella and James interviewed the mother.

The interview of the mother took place before the search warrant was executed, while Detective Casey was still at the police station.  Casey was present for the interview.  The mother told Martella and James that Clara's biological father is T.S., an inmate in state prison, with whom she has no contact. The mother acknowledged dating and living with J.A., but claimed she did not know if J.A. sold or used drugs.

According to the Division's report, when Martella asked why the mother had left Clara at home, the "mother responded that she was going to [a] CVS [store] to purchase cough medicine for [Clara]."  When asked why neither the mother nor J.A. stayed home with Clara, the mother's response was that she does not drive because "she hurt her spine," and that J.A. supposedly "would not have known what kind of medicine to buy."

Martella and James then left the police station and arrived at the mother's home around 5:30 p.m., where they encountered two police officers outside. They were told the officers were waiting for the issuance of a search warrant. Martella and James then went next door to the neighbor's house where Clara, by that point, was safely located.

The Division workers picked up Clara and took her to the hospital for a pre-placement physical. Once at the hospital, Martella interviewed Clara. The Division's report reflects that Clara told Martella that her "mother left her alone that day while she went to the store to get medicine." According to the report, Clara also told Martella that her "cough hurts and throat hurts."

While Martella was interviewing Clara at the hospital, James went to the home of the mother's sister, J.M., to conduct a home assessment for a potential placement of Clara. After performing background checks of everyone living in the home, the Division placed Clara in J.M.'s home on an emergency basis.

The following day, James (possibly accompanied by Martella) interviewed J.A. at the Atlantic County Jail. The caseworker informed J.A. that he was an "alleged perp" in this case. The worker then asked J.A. if he thought it had been safe to leave Clara home alone, if only to go to CVS. As indicated in the Division report, J.A. responded that Clara "was left in the home with a pit bull, and the house alarm on." J.A. also reportedly stated that he had notified an unnamed "neighbor's girlfriend" that he and Clara's mother were running to the store, and asked her to "keep an eye on" Clara.

The mother did not testify in her own behalf at the fact-finding hearing. She presented no witnesses. Nor did the Law Guardian for Clara, who joined

with the Division in urging the judge to find the mother had neglected Clara in violation of Title Nine.

B.

After considering these proofs, the Family Part judge concluded the mother and J.A. had abused or neglected Clara within the meaning of N.J.S.A. 9:6-8.21(c)(2) and (c)(4)(b). With regard to the allegations of drug-dealing activity, the judge found that, although he was "mindful that there was no actual lab report in this case," based upon Detective Casey's training and experience, and other surrounding events, the court could "circumstantially decide" by a "preponderance of the evidence" that illegal drugs were present.

The trial judge also found that Clara had been left home alone. He based his ruling on several proofs: (1) the mother's admission to the Division caseworkers, in the presence of Detective Casey, that she had left Clara home to go to the CVS; (2) J.A.'s admission of that same fact to the Division worker; and (3) Clara's statements to the Division worker, which were corroborated by the other statements. As the judge summarized his "collective" reasons:

> [C]ollectively when you take the [police] officer's [testimony and] . . . listening to the investigation of the [case]worker where mom admitted she's left home alone, you take a child's statement, and you take the two statements from the defendants, collectively you have a

> picture that's corroborated, reliable and credible, that the child was left home alone[.]

Eventually Clara was returned to her home in the custody of the mother. The trial court terminated the litigation in October 2018. The mother then filed the present appeal. J.A. is no longer involved in this litigation.

## II.

### A.

The applicable law under Title Nine is well established. Where the Division seeks temporary custody of a child based on a belief that a child has been neglected or abused, pursuant to N.J.S.A. 9:6-8.21, the trial judge is to conduct an evidentiary hearing, after which the judge must make specific factual findings to determine "whether the child is an abused or neglected child[.]" N.J. Div. of Youth & Family Servs. v. J.Y., 352 N.J. Super. 245, 261-62 (App. Div. 2002) (citations omitted). At the fact-finding hearing, "only competent, material and relevant evidence may be admitted." N.J.S.A. 9:6-8.46(b). The Division bears the burden of proving abuse and neglect by a preponderance of such competent evidence. Ibid. If the court is satisfied that this burden has been established, it "shall state the grounds for [such] findings." N.J.S.A. 9:6-8.50(a).

Abuse and neglect, as defined by N.J.S.A. 9:6-8.21(c), occurs when

> [a] child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian . . . to exercise a minimum degree of care . . . in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment; or by any other acts of a similarly serious nature requiring the aid of the court.
>
> [N.J.S.A. 9:6-8.21(c)(4).]

The statute does not require that the child experience actual harm. N.J.S.A. 9:6-8.21(c)(4)(b). See N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 449 (2012) (explaining the Division need not wait until a child experiences an actual injury); see also In re Guardianship of D.M.H., 161 N.J. 365, 383 (1999) (stating the court does not need to "wait to act until a child is actually irreparably impaired by parental inattention or neglect"). Instead, a child can be abused and neglected if his or her physical, mental, or emotional condition has been "impaired or is in imminent danger of becoming impaired." N.J.S.A. 9:6-8.21(c)(4)(b) (emphasis added).

The Title Nine analysis is fact-sensitive, and the court must consider the totality of the circumstances. N.J. Div. of Youth & Family Servs. v. P.W.R., 205 N.J. 17, 33 (2011). The primary focus of these standards is to preserve the safety of the child. N.J.S.A. 9:6-8.8.

As the Supreme Court has explained, the abuse or neglect is proven when the Division demonstrates, by a preponderance of the evidence, that a parent has failed to exercise a "minimum degree of care." G.S. v. Dep't of Human Servs., 157 N.J. 161, 181 (1999) (citation omitted). A "minimum degree of care" encompasses conduct that was grossly or wantonly negligent, but not necessarily intentional. Id. at 178. Wanton negligence is conduct that was done with the knowledge that injury is likely to result. Ibid. A parent's action or inaction can rise to the level of wanton negligence, even if he or she did not intend to cause injury. Id. at 179. Moreover, a parent should be liable in this context for the foreseeable consequences of his or her choices. Ibid.

## B.

Our scope of review of a trial court's factual findings in an abuse or neglect case is narrow. N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 278-79 (2007) (citations omitted). We generally defer to the decisions of the Family Part because the trial court has the opportunity to make first hand credibility judgments and has the "feel of the case." N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 342-43 (2010). A Title Nine fact-finding decision should only be reversed or altered on appeal if the findings below were "'so wholly unsupportable as to result in a denial of justice.'" N.J. Div. of Youth & Family

Servs. v. P.P., 180 N.J. 494, 511 (2004) (quoting In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)).

As we will discuss in more detail, infra, the mother argues the trial judge improperly allowed inadmissible hearsay evidence, and unfairly relied upon such hearsay in his fact-finding. As a general rule, with respect to the exclusion or admission of evidence, we afford "[c]onsiderable latitude . . . [to a] trial court[.]" N.J. Div. of Child Prot. & Permanency v. N.T., 445 N.J. Super. 478, 492 (App. Div. 2016) (quoting State v. Kuropchak, 221 N.J. 368, 385 (2015)). Such a determination on admissibility "will be reversed only if it constitutes an abuse of discretion." Kuropchak, 221 N.J. at 385. With these standards in mind, we turn to the mother's arguments for reversal.

C.

As an overarching point, the mother argues there was insufficient evidence to support the Division's claims of abuse or neglect. She contends Detective Casey had no first-hand knowledge of Clara being left alone at the house unsupervised, and that the Division cannot establish that critical fact from the hearsay documents. As an alternative argument, she contends she was unconstitutionally deprived of a due process right to confront hearsay declarants whose information was contained in the records.

Additionally, the mother argues she should not be blamed for the drug activity in the household because she could not control it. She asserts there is no proof that Clara was actually harmed by being present while drugs allegedly were being bought and sold. She further emphasizes no testing of the substances was conducted in this case to confirm they were actually illegal drugs. The Division and Law Guardian both oppose these contentions.

We topically divide our analysis of these issues into two parts: (1) the court's finding that the mother and her boyfriend J.A. neglected Clara by leaving her alone at the house, and (2) neglected Clara by allowing her to be in a house where drug dealing was occurring.

1.

We do not accept the mother's excuse that she needed to accompany J.A. to buy cough medicine because he might not be able to find it at the store. Rather than leaving her four-year-old child unattended, she should have stayed home, where J.A. could have called her from the store with any questions about what to purchase. Alternatively, she might have brought Clara to the store with her and J.A., as there is no proof the child was too sick to accompany them for such a trip.

A-1368-18T1

We reject the mother's contention that the trial court based its decision about the child's abandonment solely on Detective Casey's testimony. To the contrary, the court concluded that Clara was left home alone based on multiple items of evidence: (1) the mother's statement to the Division workers, documented in the investigation summary, acknowledging that Clara was left at home while the mother and J.A. went to CVS; (2) Casey testifying that he was present when this statement was made; (3) J.A.'s statement about the child's abandonment to the Division workers, as documented in the investigation summary; and (4) Clara's statement to the Division workers, documented in the investigation summary, that she was left home alone, which was corroborated by other evidence.

The Division's investigation summary was properly admitted into evidence under N.J.S.A. 9:6-8.46(a), which provides:

> In any hearing under this act . . . any writing, record or photograph . . . made as a memorandum or record of any condition, act, transaction, occurrence or event relating to a child in an abuse or neglect proceeding of any . . . public or private institution or agency shall be admissible in evidence in proof of that condition, act, transaction, occurrence or event, if the judge finds that it was made in the regular course of the business . . . at the time of the condition, act, transaction, occurrence or event, or within a reasonable time thereafter, shall be prima facie evidence of the facts contained in such certification.

A-1368-18T1

[N.J.S.A. 9:6-8.46(a).]

As James attested, the report was created within a reasonable time after the investigation, and drafted in the course of the Division's business. Based on this unrefuted foundation, the investigation summary was properly admitted into evidence under the statute.

The statements contained within the investigation summary that the court relied upon meet well-established hearsay exceptions and thus were properly considered. In particular, the mother's statement that she and J.A. left Clara to go to CVS is admissible as a statement by a party-opponent, and not excluded by the hearsay rule. N.J.R.E. 803(b)(1).

J.A.'s hearsay statements in the investigation summary are similarly admissible. When informed by a Division worker that he was an "alleged perp" in this case, J.A. responded that Clara was left in the home with a pit bull and the house alarm on while he and the mother went to CVS. He also stated that he notified the neighbor's girlfriend that they were running to the store and for her to "keep an eye" on Clara.

These assertions by J.A. were properly admitted and considered as statements against his interest. N.J.R.E. 803(c)(25). This exception to the hearsay rule declares admissible:

> [a] statement which was at the time of its making so far contrary to the declarant's pecuniary, proprietary, or social interest, or so far tended to subject declarant to civil or criminal liability . . . that a reasonable person in declarant's position would not have made the statement unless the person believed it to be true.
>
> [N.J.R.E. 803(c)(25).]

The test of admissibility under N.J.R.E. 803(c)(25) is "whether, in the context of the whole statement, the particular remark was plausibly against the declarant's . . . interest . . . ." State v. Nevius, 426 N.J. Super. 379, 394 (App. Div. 2012) (quoting State v. Abrams, 140 N.J. Super. 232, 236 (App. Div. 1976), aff'd o.b., 72 N.J. 342, 370 (1997)). After being informed that he was an "alleged perp" in the investigation, J.A. admitted to leaving a four-year-old child home with a pit bull and the alarm system activated. He also agreed that leaving a four-year-old home alone was dangerous. These statements reasonably can be construed as being against his interest.

Although J.A. is not Clara's biological father, there is evidence that J.A. acts as a father-figure to Clara. In the Division's investigation summary, Clara herself told Martella that J.A. is her "father." The child also told Martella that J.A. drives her back and forth to school, and "hit [her] butt when [she] pooped [her] pants." These statements signify that J.A. played a significant role in Clara's life. He evidently took on responsibilities of a caretaker, and disciplined

17

Clara. J.A. is not a disinterested third party who only happens to be the boyfriend of the mother.

Moreover, his statements reflected a reckless failure to assure the four-year-old child's safety in the absence of him and her mother. Leaving a pit bull at home with a burglar alarm on does not protect a child from having an accident while she is left alone. Nor is there proof that an unnamed neighbor was watching her.

This Supreme Court's recent decision in Rowe v. Bell & Gossett Company, ___ N.J. ___, ___ (2019) (slip op. at 33), makes clear that a statement against interest under N.J.R.E. 803(e)(25) does not need to be used against the declarant of the statement. Rather, such a statement can be used against a third party. Ibid. Here, J.A.'s statements against interest were properly admitted against the mother, and relied upon by the judge in his analysis.

Apart from this proof, the judge also appropriately relied on Clara's statements made to the Division worker. Clara told Martella that she was left home alone, and that "when mommy leaves I be scared." That hearsay assertion is admissible in this Title Nine context, as a previous statement by a child corroborated by other evidence under N.J.S.A. 9:6-8.46(a)(4). The statute provides:

[P]revious statements made by the child relating to any allegations of abuse or neglect shall be admissible in evidence; provided, however, that no such statement, if uncorroborated, shall be sufficient to make a fact finding of abuse or neglect.

[N.J.S.A. 9:6-8.46(a)(4).]

The trial court properly found Clara's statements were corroborated by the statements of the mother and J.A. to the Division workers, as well as Detective Casey's testimony that he was present for and heard the mother's statements. Based on the combination of these statements and Casey's testimony, the court properly found that the Division met its burden by a preponderance of the evidence to show that Clara had been unsafely left home alone.

The mother cites New Jersey Div. of Child Prot. & Permanency v. N.B., 452 N.J. Super. 513, 526-27 (App. Div. 2017), for the proposition that a Title Nine fact finding hearing conducted almost entirely on the papers, as she asserts was done here, is not sufficient for a finding of abuse or neglect. N.B. is distinguishable. In N.B., the only Division witness who presented live testimony was a supervisor who lacked personal knowledge of the incident and conducted none of the interviews. Ibid. Although the trial court did rely in the present case upon portions of the Division's investigation summary, there is ample testimony in this case to corroborate those facts. As we have noted, Casey

testified he was present when the mother told Martella and James that she had left Clara home while she and J.A. went to CVS.  Further, James was the Division worker who authenticated the investigation summary, and she personally was present for all of the critical interviews except for that of Clara.

We are mindful of the trial court's reference to a portion of Detective Casey's testimony stating that police officers were surveying the property the entire time the mother and J.A. were gone.  We agree this particular detail was inadmissible hearsay, because Detective Casey was not present the whole time, and he presumably was only aware of this information through hearsay of what other officers had told him.  See N.J.R.E. 602 (the personal knowledge requirement).  Even so, based on the clear weight of the other admissible evidence, there are more than ample grounds to affirm the court's finding that Clara was left home alone.

### 2.

With respect to the drug dealing issues, the mother stresses Detective Casey was not present when the alleged substances were found, and therefore his testimony was insufficient for the trial court to make a finding that drugs were in the home of the child.  The mother also notes no laboratory certification was admitted into evidence showing that the substances seized were, in fact,

heroin. She also contends the Division failed to prove that she was connected to the drugs in any way.

Despite these arguments, there was ample evidence to support a reasonable inference, by a preponderance of the evidence, that Clara was living in a home where drugs were being illegally distributed. Casey testified that he had observed several "hand-to-hand" transactions on site, and that he was present when the substances were found. Although Casey was not the police officer who found the drugs, he testified to seeing the "King of Death" stamp on the substances.

Casey's testimony, which the judge found credible was sufficient for the court to conclude that drug dealing was taking place in the premises. Casey is an experienced police officer of twelve years, and has been a detective for five years. He observed the same "King of Death" stamp on the substances that was the subject of the Ocean County Prosecutor's investigation.

Even if, for the sake of argument, we ignored the drug-related testimony, the mother's conduct in knowingly leaving a sick four-year-old child home alone is sufficient to make a finding of abuse or neglect. Consideration of the drug evidence would only be, at worst, harmless error. See State v. Tillery, 238 N.J. 293, 319 (2019) (holding the trial court's mistaken decision to admit evidence

of defendant's statements to police was harmless error) See also Pellicer ex rel. Pellicer v. St. Barnabus Hosp., 200 N.J. 22, 55 (2009) (recognizing that "even a large number of errors, if inconsequential, may not operate to create an injustice" and require a civil judgment to be set aside); Nicosia v. Wakefern Food Corp., 136 N.J. 401, 412 (1994) (declining to order a new trial in a civil case where the trial court's errors were not shown to be harmful). Such harmful error has not been demonstrated here.

D.

The mother further argues that, even if the Division could establish that Clara had been left home alone, that conduct does not rise to the level of gross negligence, because the Division was required to prove that she was aware that Clara was unsupervised. See G.S., 157 N.J. at 181. She further argues that the Division failed to show that Clara was in "imminent danger." We disagree.

By way of comparison, in Div. of Youth & Family Servs. v. T.B., 207 N.J. 294 (2011), a mother left her four-year-old child home alone, incorrectly believing the child's live-in grandmother was then home with her. Id. at 297. The grandmother's car was in the driveway, and the mother stated the grandmother was "always home" and "in bed early" on Sunday nights. Ibid. The grandmother and grandfather gave statements at the police station and

22

attested to the fact that the grandmother always was home on Sunday nights, and made an impromptu trip to New York on that particular night. Id. at 298. This court affirmed an administrative finding of abuse and neglect, but the Supreme Court reversed. Id. at 310. The Court noted in T.B. that "[t]his was a close case," and "[the mother] was plainly negligent," however, "[t]his is not a situation in which she left her four-year-old son at home alone knowing there was no adult supervision." Id. at 309-10.

Unlike in T.B., where a mother genuinely, albeit negligently, believed that the child's grandmother was home, here, the mother admitted to deliberately leaving Clara at home while she and J.A. went to CVS. There is no indication that the mother believed anyone was home with Clara. To the contrary, Casey testified that he was present when she admitted to leaving Clara home alone. Casey's testimony, combined with the statements of the mother, J.A., and Clara, constituted sufficient grounds for the court to find that Clara was knowingly left home alone without supervision.

J.A.'s statement that he asked the neighbor's girlfriend to "keep an eye" on Clara is not sufficient to prove that he and the mother reasonably believed Clara was being supervised. Notably, the mother never claimed this or presented any corroboration of it.

23

The mother also argues that, even if Clara was left home alone, the Division failed to show that Clara was in "imminent danger," as required under the statute, N.J.S.A. 9:6-8.21(c)(4). Her argument fails to appreciate the dangers that inherently attach to leaving a young child unsupervised. In N.J. Dep't of Children & Families v. R.R., 436 N.J. Super. 53, 55 (App. Div. 2014), this court affirmed a finding of abuse or neglect when a bus driver left a five-year-old alone on the bus for almost one hour. Although the child was found asleep and unharmed, this court nonetheless found that leaving a minor child alone on the bus constituted abuse or neglect. Id. at 57. Here, the fact that Clara fortunately was unharmed while the mother left her alone at the house does not excuse her dangerous conduct. See F.M., 211 N.J. at 449 (explaining that the Division need not wait until a child experiences an actual injury).

E.

We need not comment on the mother's final argument, raised for the first time on appeal, contending she was denied a constitutional due process right to confront witnesses. See State v. Robinson, 200 N.J. 1, 20 (2009) (noting that courts on appeal disfavor reaching issues not raised below); see also Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973) (same). We decline to reach this newly minted argument, which would require a major leap in precedent that the

24

Supreme Court has not undertaken.  Moreover, as we have already shown, this is a poor case to reach such a confrontation claim, because there is ample proof of the mother's Title Nine liability based on the testimony of the witnesses who were examined and duly cross-examined.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1368-18T1