# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0743-24

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

S.T.,[1]

      Defendant-Respondent,

and

J.E. and R.W.,

      Defendants.

_____

IN THE MATTER OF
A.T.-E., a minor,

      Appellant,

and

---

[1]  We use fictitious names to protect the identities of the minors and refer to defendants by their initials.  See R. 1:38-3(d)(12).

L.W., S.E., J.E.,
and A.E., minors.

_____

Argued May 21, 2025 – Decided June 13, 2025

Before Judges Currier, Paganelli and Torregrossa-O'Connor.

On appeal from an interlocutory order of the Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FN-12-0108-24.

Jennifer M. Sullivan, Assistant Deputy Public Defender, argued the cause for appellant A.T.-E. (Jennifer Nicole Sellitti, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; Jennifer M. Sullivan, of counsel and on the briefs).

Megan Mallon, Deputy Attorney General, argued the cause for respondent Division of Child Protection and Permanency (Matthew J. Platkin, Attorney General, attorney; Donna Arons, Assistant Attorney General, of counsel; Megan Mallon, on the brief).

Sarah Schneider, Assistant Deputy Public Defender, argued the cause for respondent S.T. (Jennifer Nicole Sellitti, Public Defender, attorney; Sarah Schneider, on the brief).

PER CURIAM

On leave granted, the Office of the Law Guardian, on behalf of A.T.-E.

(Avery), born in June 2024, appeals from the Family Part's October 21, 2024

order entered following a Dodd removal hearing,[2] denying the New Jersey Division of Child Protection and Permanency's (the Division) application for emergency removal of Avery from her biological mother S.T.'s custody and supervision.[3] In granting leave, we ordered that the Division "shall provide 24/7 supervision of S.T. and [Avery]."

After oral arguments, but prior to release of this opinion, the Division advised, by letter dated May 30, 2025, that a different family court judge "granted the Division temporary custody of [Avery] following a May 28 Dodd removal after an intoxicated S.T. was left unsupervised with [Avery] and was committed to a mental health crisis unit." The Division further advised that Avery "was hospitalized at the time of removal for severe hypoglycemia due to missed feedings."

Although Avery's temporary removal changes the current custody status, we deem it necessary to address the family court's October 2024 decision in which it found no "imminent" threat of harm and denied the removal of Avery—

---

[2] A "Dodd removal" refers to the emergency removal of a child from a home without a court order, pursuant to The Dodd Act. See N.J.S.A. 9:6-8.21 to -8.82.

[3] The Division filed a brief in support of the Law Guardian's appeal.

A-0743-24

a fragile infant born prematurely with serious health concerns—from S.T.—then only one-month sober with a history of alcohol abuse that led to the removal of her four older children.[4] We conclude that the court's decision denying the temporary removal of Avery misapplied controlling law and lacked sufficient evidential support in the record. Accordingly, we vacate the order and remand for further proceedings in accordance with this opinion.

I.

The record before the family court at the time of its October 2024 order denying the removal revealed the following facts.

A.    Background and Division History with the Family

The Division's involvement with S.T. and her children dates back to March 2015, including prior incidents related to S.T.'s alcohol abuse. In particular, on February 16, 2024, prior to Avery's birth, the Division filed an Order to Show Cause (OTSC) for temporary custody of S.T.'s four children, Arlo, Jacob, Sloane, and Lennox, all under the age of thirteen, accompanied by a Verified Complaint for Custody. The OTSC specifically centered around an incident that occurred on February 13, when, according to the Division, "police

---

[4] Orders regarding the older children are not the subject of this appeal.

A-0743-24

arrived at the home [and] found [S.T.] . . . . so severely intoxicated that she could not speak."

The Division alleged that a "police officer saw [Lennox] . . . bleeding from her face." She had "a cut on her nose[,] . . . an inch cut on her left eye," and "bite marks near her left eye." The Division further alleged that Lennox "reported that she was bitten by [S.T.], who also pulled her hair," and explained that "the cuts on her face were caused by [S.T.]" who, according to Lennox, "drank alcohol daily."

S.T. was transported to the hospital for her intoxication where she learned that she was pregnant with Avery. S.T. was charged with second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1), second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(2), and the Title 9 offense of fourth-degree child abuse and neglect, N.J.S.A. 9:6-1.

The Division effectuated a Dodd removal of S.T.'s children; and Arlo, Jacob, and Sloane were placed with the children's maternal grandfather, while Lennox was placed in the care of her father, R.W. Following a hearing, the court entered an order granting the Division's application for care, custody, and supervision of Sloane, Jacob, and Arlo, and care and supervision of Lennox, finding "removal of the child(ren) was required due to imminent danger to the

5

child(ren)'s li[ves], safety or health." The Division then transferred care and supervision of Arlo, Jacob, and Sloane to their maternal grandfather, but maintained legal custody of the children. Both parents retained joint legal custody of Lennox.

The court granted S.T. supervised visitation twice weekly of Arlo, Jacob, and Sloane for a duration of two hours each day. She was also granted supervised visitation with Lennox at Lennox's discretion. S.T. consented to "comply with the recommendations of her substance abuse treatment program, specifically an intensive outpatient level of care or higher."

In February 2024, S.T., pregnant with Avery, missed a visit with the Division because she was transported to the hospital for intoxication and remained at the hospital until March 4, 2024. Her visitation with the children was suspended. On June 3, 2024, S.T. entered a "Voluntary Stipulation and Admission to Child Abuse and/or Neglect Pursuant [t]o N.J.S.A. 9:6-8.21(c)." S.T. admitted that while in a caretaking role, she "struck [Lennox] while intoxicated, causing her injury." At the June 3 hearing, the Division maintained its position that S.T. was not ready to exercise supervised visitation; and the court agreed, ordering a psychological examination of S.T. Supervised visitation with all but Lennox was restored in late June.

6

In June 2024, S.T. gave birth to Avery, born prematurely at twenty-six weeks, weighing 1.8 pounds, who suffered "two brain bleeds" and was placed on a ventilator. Avery remained hospitalized in the neonatal intensive care unit (NICU) as the proceedings regarding S.T.'s custody and supervision of all her children continued. S.T. regularly visited Avery in the hospital.

Karen D. Wells, Psy.D., performed a psychological evaluation on August 14, 2024, issuing a report reflecting her findings on September 24, 2024. She found that "[w]hile [S.T.] acknowledged that she had experienced adverse consequences associated with her drinking, she was noted to minimize her abuse of alcohol, citing that her use was not problematic and that she had and could . . . stop drinking when she opted." Dr. Wells concluded that S.T., who apparently worked at some point "in the medical field," "has a basic understanding of what is needed to attend to the needs of her children; however, her considerable minimization of her abuse of alcohol and the inability when under the influence of such to effectively care for her children is of grave concern." She further determined that S.T.'s denying a substance abuse problem was "contrary to the repeated reports citing that [S.T.] has used alcohol excessively and exercised poor judgment, including driving while under the

influence, brutally beating her daughter, [Lennox], and drinking during her pregnancy with [Avery]."

Therefore, Dr. Wells "strongly recommended that [S.T.] . . . engage in an [i]ntensive [o]utpatient [p]rogram in hope that she will come to recognize that she indeed has a problem that needs more than just her decision to temporarily abstain." (Emphasis omitted). Dr. Wells indicated that S.T. should "continue to receive random screenings to assess for alcohol and any illicit substance[s], . . . participate in individual therapy[,] . . . [and] engage with persons who are committed to abstaining from alcohol and support her in her efforts to remain sober."

Dr. Wells cautioned that Avery should be placed with S.T. only "contingent upon implementation of 24/7 supervision," and that "[i]n the absence of available supervision, . . . family members [sh]ould be assessed to determine their eligibility and willingness for placement of [Avery] in their care." She indicated that if the latter is necessary, S.T. "[sh]ould have ongoing, regular, and liberal supervised contact with [Avery] to strengthen their bond."[5]

---

[5]  Dr. Wells found it was "[u]ndeniable" that the Division should continue its involvement with S.T.'s family, recommending that Arlo, Jacob, and Sloane remain in the care and custody of the Division "pending [S.T.]'s sustained

Subsequently, on October 17, 2024, the court held a compliance review hearing. It was undisputed that S.T. had tested positive for alcohol twice in late September and thereafter tested negative for substances in two subsequent screenings. S.T. continued to participate in an additional program to address her "substance abuse issues while pregnant and post-partum" and submit to the random screens through her program. However, the Division expressed "concern[]" based on Dr. Wells's psychological evaluation, highlighting the expert's finding that S.T. "dismisses [her] issues with drinking."

B.     Removal Proceedings Concerning Avery

The following day, the hospital advised that Avery was ready to be discharged from the NICU and, as a result, the Division "effectuated an emergency Dodd removal of [Avery] for the purpose of placement pursuant to the Notice of Emergency Removal[,] N.J.S.A. 9:6-8.29 [to] 9:6-8.30" and filed an OTSC and Amended Verified Complaint seeking custody of Avery pursuant

---

abstinence from alcohol, her engagement in substance abuse and mental health treatment services, and positive collaterals received from persons providing services regarding her progress." With respect to Lennox, Dr. Wells "recommended that supervised therapeutic visits [sh]ould be established to afford [S.T.] and [Lennox] the opportunity to have contact and to address the incident resulting in [Lennox] and her siblings' removal, [Lennox's] concerns, and provide a means to repair the parent-child relationship."

to N.J.S.A. 9:6-8.21 to -8.82 and N.J.S.A. 30:4C-12. A Dodd removal hearing took place on October 21. Dr. Wells and a Division caseworker, Christie Zelek, testified on behalf of the Division, and S.T. testified on her own behalf.

Dr. Wells reiterated her opinion that S.T. was incapable of caring for Avery absent supervision "24/7," citing S.T.'s lack of "personal responsibility, despite the information that she reported," and S.T.'s "minimization of the difficulties that she experienced with alcohol and how that had adverse consequences to herself, her children[,] and, overall, her life." Dr. Wells noted learning that S.T. tested positive for alcohol after her psychological evaluation, finding this contrary to S.T.'s reporting at the time of her evaluation that "she had not been drinking since March."

The expert also opined that alcohol "severely impair[s]" judgment, and contact with a newborn, not even accounting for a "medically fragile" newborn, presents risks of, "co-sleeping, dropping the baby, not attending[,] not being responsive if the baby is choking," and such risks "could result in a fatality." Dr. Wells acknowledged S.T. "knows how to take care of a baby," "[b]ut under the influence, the . . . severe risk of harm is unimaginable." She highlighted the importance of a parent to be able to care for a newborn at all hours, noting that

10

S.T. was admittedly "under the influence of alcohol at 11[:00] in the morning, the day [she attacked Lennox]."

Zelek, a Family Services Specialist with the Division, indicated the Division held numerous "family team meeting[s]" aimed at finding a way to reunify S.T. and Avery upon Avery's discharge from the hospital. However, according to Zelek, when S.T. tested positive for alcohol, "the [D]ivision's concerns escalated," noting that the positive screenings were "a week apart which implied that there w[ere] multiple uses of alcohol." Zelek explained that the Division at that time had attempted but was unable to secure a safe means to place Avery with S.T. with 24/7 supervision. Zelek advised that S.T. rejected the Division's suggestions that S.T. and Avery move in with S.T.'s sister or alternatively enroll in a "Mommy and Me" residential program.

S.T. testified that, in her view, she was qualified to care for Avery because she worked in the medical field and had cared for her older son who was also premature and sent "home with oxygen and pulse ox." She also admitted to having consumed alcohol in September when she tested positive in two screenings, claiming she drank "probably like a half pint . . . [o]f [v]odka." She stated that she drank as she felt she was "damned if [she] d[id], . . . damned if [she] d[id not]." The court then questioned S.T. directly, asking her, "[D]o you

11

understand that if [Avery] is in your care, you can't consume alcohol at all," to which S.T. replied, "I do[ not] want to. I do[ not] care to."

Following the testimony, the court rendered an oral decision, denying the Division's application to uphold the Dodd removal and finding no "imminent" threat to Avery. The court noted "there's no safer place in the world than an infant being in a hospital," citing to the Supreme Court's decision in New Jersey Division of Child Protection & Permanency v. B.P., 257 N.J. 361, 365 (2024), and indicated Avery had not yet been released from the hospital.

Despite acknowledging that Dr. Wells's opinions "carr[ied] a lot of weight," the court nevertheless found S.T.'s testimony "hurt[] the idea of there being an imminent threat" should Avery be released to S.T.'s care because S.T. "told [the court] she's not going to drink." The court specifically rejected concerns of S.T.'s future drinking, stating, "Well, there's not many things you can guarantee in life."

Identifying its "overriding" concern as ensuring S.T. and Avery remained together, the court explained it was "putting some faith in [S.T.], that between

12

[C]omfort [C]are[6] and her knowing what she needs to do for her kid, she's not going to be drinking." The court found "it would be against [Avery]'s interest to just be in some resource home . . . [because] she needs to be around her mother." The court determined that S.T. "knows what would happen if she drinks again."

The court incorporated a "self-executing order[]" in its decision, noting that if S.T. failed any drug test or urine screen, or was found intoxicated, legal and physical custody of Avery would be transferred to the Division. The court also ordered that the Division "immediately begin the process for implementing Comfort Care for 24/7 assistance to [S.T.], with a minimum of overnight assistance being required." Although it acknowledged the Division's present inability to staff around the clock supervision, the court viewed that as "speculation" and "if it's in place, it's going to be there 99.9% of the time. And if there's a problem, then we deal with it."

On October 24, the Division filed a letter with the court "seeking clarity and requesting an amendment" to the court's order to require "supervision" of

---

[6] The court ordered that Comfort Care serve as the agency responsible for assisting S.T. "with a minimum of overnight assistance being required." Comfort Care is an in-home healthcare service that offers services designed to "[g]uide parents to enhance their parenting skills."

13

S.T. and Avery, rather than "assistance to [S.T.]" By email dated October 25, court staff advised that the court "d[id] not think an amendment of the order [wa]s necessary." Court staff relayed that the court "d[id] not believe [S.T.] need[ed] to be constantly supervised with the baby" and that the order contemplated "24/7 assistance, with the hours possibly being reduced but the seven days a week not being affected."

On October 25, the Law Guardian filed an OTSC on behalf of Avery seeking: (1) reconsideration of the court's order denying the Division's application for custody of Avery, or, alternatively, an order requiring supervision twenty-four hours a day, seven days a week, (2) a statement of the court's "findings of facts and conclusions of law with particularity as to the terms that are currently in dispute between the parties, namely the level and amount of supervision that is to be implemented for unification to occur between [Avery] and [S.T.]," and (3) a stay if the aforementioned relief was denied. The Law Guardian attached email correspondence sent from Avery's grandmother to the Law Guardian on October 28, reporting concern over Avery's placement with S.T., indicating S.T. had claimed, "if I can't have my kids, no one can[.] [I] will drive off a bridge with [Avery] and whatever other kid is with me."

A-0743-24

Without a hearing, the trial court issued an order on October 28 denying the Law Guardian's application, finding "the Law Guardian's motion [wa]s simply an attempt to reargue the issues decided by the [c]ourt in its October 21, 2024 [o]rder." It further determined that pursuant to its previous order, S.T. "[wa]s to receive assistance from Comfort Care for [twenty-four] hours a day, if possible, with at least [twelve] hours at night mandatory," every day of the week. (Emphasis added).

We granted leave to appeal and ordered the Division to "provide 24/7 supervision of S.T. and [Avery]" pending further review. On the eve of oral argument, we granted a motion later filed by S.T. to supplement the record with the Family Part's April 4, 2025 order, granting S.T. unsupervised visitation with Sloane, Jacob, and Arlo "at the discretion of the children," and further setting forth a specific parenting time plan that contemplated three unsupervised visits per week beginning on May 5, 2025 and granting S.T. one overnight visit per week beginning on May 19, with the condition that "there are no concerns about [S.T.]'s alcohol use or any verbal or physical maltreatment of the minor children." The court referenced an updated psychological evaluation performed by Dr. Wells on February 15, 2025, apparently recommending S.T. exercise supervised visits with the three children "up to three times a week, preferably at

15

[S.T.]'s home, with consideration for [S.T.]'s need to maintain medical appointments for [Avery] and herself as well as [S.T.]'s engagement in services."

At oral argument, both the Law Guardian and the Division modified their requested relief, asking that this court vacate the October denial of removal, keep the 24/7 supervision order in place, but remand for a further hearing to consider the issues of custody and supervision of Avery and allow for consideration of the updated Dr. Wells evaluation, S.T.'s conduct and Avery's welfare in the months since the October 2024 order, and the impact, if any, of the court's newest order regarding the older children.

As stated, we were advised after oral argument that a different family court judge removed Avery from S.T.'s custody and care, and both are hospitalized—Avery for medical reasons and S.T. for psychiatric concerns.

## II.

Against this factual and procedural backdrop, we review the court's decision denying removal. Given their special expertise in family matters, we uphold factual findings of family courts "whenever they are 'supported by adequate, substantial and credible evidence.'" In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993) (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 483-84 (1974)). We intervene, however, when a

court's findings are "so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Cesare v. Cesare, 154 N.J. 394, 412 (1998) (quoting Rova, 65 N.J. at 484). "[A] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." K.D. v. A.S., 462 N.J. Super. 619, 634 (App. Div. 2020) (quoting Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

"Parents have a fundamental constitutional right to raise their children." N.J. Div. of Youth & Fam. Servs. v. J.Y., 352 N.J. Super. 245, 261 (App. Div. 2002). Even this fundamental right is "tempered by the State's parens patriae responsibility to protect the welfare of children." Ibid. (citing Parham v. J.R., 442 U.S. 584, 603 (1979); In re Guardianship of K.H.O., 161 N.J. 337, 347 (1999)). Undeniably, a parent's interest must, at times, yield to the State's obligation to protect children from harm. See N.J. Div. of Youth & Fam. Servs. v. G.M., 198 N.J. 382, 397 (2009). "Thus, in order to relieve the tension created by these potentially disparate constitutional principles, the court's authority to remove children from the custody of their parents must be exercised with scrupulous adherence to procedural safeguards." J.Y., 352 N.J. Super. at 261.

A-0743-24

Here, the Division sought relief by Verified Complaint filed pursuant to N.J.S.A. 9:6-8.21 to -8.82 and N.J.S.A. 30:4C-12. When the Division removes a child from a parent on an emergency basis premised on an allegation of abandonment, abuse, or neglect, it may proceed under both Title 9 and Title 30 in a consolidated manner. See N.J. Div. of Youth & Family Servs. v. R.D., 207 N.J. 88, 113 (2011) (citing N.J.S.A. 9:6-8.24(e)).

N.J.S.A. 9:6-8.29(a) permits emergency removal of a child if "the child's continuance in the place or residence or in the care and custody of the parent or guardian presents an imminent danger to the child's life, safety, or health, and there is insufficient time to apply for a court order pursuant to [N.J.S.A. 9:6-8.28]." In reviewing emergent removal under N.J.S.A. 9:6-8.28, a court must be "guided by the overriding principle that 'the safety of the child shall be of paramount concern,'" J.Y., 352 N.J. Super. at 259 (quoting N.J.S.A. 9:6-8.28), and must ultimately determine whether "continued removal is necessary to avoid an ongoing risk to the child's life, safety, or health," N.J.S.A. 9:6-8.31(b).

N.J.S.A. 30:4C-12 also allows for emergent removal absent an abuse or neglect allegation. This court has stated:

> As with the procedure outlined in Title 9, the court must conduct a summary hearing . . . [and] the burden of proof is upon [the Division] to present sufficient

competent and credible evidence to satisfy the judge that the best interests of the child, as defined by the statute, requires ordering the requested emergent involuntary placement.

[J.Y., 352 N.J. Super. at 260-61.]

Like Title 9, Title 30 recognizes "the health and safety of the child shall be the State's paramount concern when making a decision on whether or not it is in the child's best interest to preserve the family unit." N.J.S.A. 30:4C-1(a).

After our review, we are satisfied the court erred in its decision denying the Division's temporary removal of Avery when 24/7 supervision was not in place to protect the infant's safety.

Critically, the court started from the faulty legal premise that its "overriding" concern was keeping Avery with S.T., when the expressly enumerated chief concern for emergency removal is with the "safety of the child," and the "best interests of the child," under both Titles 9 and 30. N.J.S.A. 30:4C-1(a); J.Y., 352 N.J. Super. at 260-61; N.J.S.A. 9:6-8.28, -8.31. Although the goal of keeping mother and infant together is undeniably weighty, that should not preordain a conclusion regarding removal, particularly when the Division, as here, sought only temporary removal to its custody to assure

19

adequate care and supervision while the Division's concerns for Avery's immediate safety were addressed.

The court also employed an unduly restrictive interpretation of "imminent harm," misapplying the Court's holding in B.P. There, the Court defined "imminent" as used in N.J.S.A. 9:6-8.21(c)(4) as "threatening to occur immediately; dangerously impending . . . [or] about to take place." B.P., 257 N.J. at 376 (alteration in original) (quoting Black's Law Dictionary 898 (11th ed. 2019)). Applying this definition to the facts in B.P., the Court determined that the trial court erred in finding the parent who left her infant at the hospital placed the child at risk of imminent harm, noting that a hospital is, by definition, a safe place for a child. Id. at 378.

Here, in applying B.P. to these circumstances, the trial court failed to recognize that Avery was facing the precise opposite risk in being cleared for discharge from the safety of the hospital to what was then unsupervised placement in S.T.'s care.

Factually, the court failed to appropriately anchor its findings in the record. Specifically, the court disregarded that the requested removal took place only one month after S.T. relapsed and tested positive twice for alcohol, while in court-ordered treatment. This error was compounded when the court

proceeded contrary to the only expert opinion, which expressed "grave concerns" for the safety of Avery if placed in S.T.'s care without constant supervision. The court ignored Dr. Wells's opinion, as well as S.T.'s relapse or history, crediting instead S.T.'s statement that she was not going to drink, as she "d[id not] want to" and "d[id not] care to," further reflecting her poor insight into her condition. The court also overlooked the past history concerning the older children, in particular the harm inflicted upon Lennox by S.T. while intoxicated.

The court similarly made no reference to the uncontested record of Avery's medical fragility, beyond that of the average newborn. In addition, when asked for clarification and reconsideration of its initial order, the family court refused to order "supervision" of S.T. when caring for Avery, compelling only "assistance" for S.T. when available and particularly "at night." We are persuaded the court misapplied the law and its discretion in its decision.

We granted leave to appeal when the court again refused to re-evaluate its October order, after the Division raised new concerns that S.T.'s mother reported threats by S.T. to harm the children if she lost custody. We now have learned that several orders have been entered in the interim, including one removing

21

Avery from her mother's care in favor of the Division, while both undergo respective hospitalizations.

We note the subsequent history only as a vital caution that the focus of all Dodd removals must begin and end through the lens of securing the safety of the child. A court "need not wait . . . until a child is actually irreparably impaired by parental inattention or neglect." In re Guardianship of D.M.H., 161 N.J. 365, 383 (1999).

The October 2024 order denying removal is reversed and vacated, and we remand for further proceedings as deemed necessary and appropriate by the trial court in light of recent events and court orders. We decline the Law Guardian's request to direct that any future proceedings take place before a judge other than the judge who denied the initial request for removal, as we are satisfied that this opinion has provided the necessary guidance for any judge moving forward.

Vacated and remanded for further proceedings in accordance with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division